OPINION OF THE COURT
Harold Tompkins, J.
FINDINGS OF FACT
Based upon the preponderance of the evidence, the court finds:
(1) Plaintiff Kevin F. Smith (Smith) commenced this action *14 against defendant Brown & Jones (B&J), a law partnership, in the fall of 1991 asserting three causes of action: breach of the covenant of good faith and fair dealing, breach of contract and breach of fiduciary duty. B&J is a prominent midtown Manhattan law firm.
(2) Smith, an attorney with extensive experience in banking, corporate and securities law, joined the law firm of B&J as a partner in January 1986.
(3) Upon joining B&J, Smith signed the B&J partnership agreement dated May 29, 1985, effective January 13, 1986 (the Partnership Agreement).
(4) There is no dispute that pursuant to the Partnership Agreement, Smith had the right to resign upon the giving of proper notice.
(5) Upon joining B&J Smith made a capital contribution of $50,000.
(6) Smith gave proper notice of his resignation pursuant to the terms of the Partnership Agreement on August 16, 1990. He resigned effective August 31, 1990. He thereafter left for another prominent Manhattan law firm.
(7) Smith’s resignation did not cause a dissolution of B&J. Subsequent to his resignation, B&J continued with the same partners, at the same location and with the same clients.
(8) Smith billed his clients for services rendered prior to his effective date of resignation. All partnership profits earned for plaintiffs services prior to his resignation were received by the defendant B&J.
(9) The Partnership Agreement has three provisions which apply to compensating a withdrawn partner. The Agreement provides that (1) the partner is entitled to the return of his capital account; (2) the partner is entitled to be compensated for the period in which he was a partner prior to his withdrawal, in accordance with the custom and practice which applies to all B&J partners; and (3) a formula payment applies to compensate the withdrawn partner for his interest in the B&J receivables and work-in-progress. The formula payment in clause (3) is wholly separate from the payment referred to in clause (2). Clause (3) applies to the six-month period following withdrawal and is based upon the partner’s prior year’s percentage of total partnership profits.
(10) The Partnership Agreement is silent as to the precise method of compensating partners for their contribution to the *15 profits of B&J, and such compensation is determined annually according to custom and practice developed over the course of many years.
(11) B&J paid Smith his capital account and paid him his formula payment with respect to the six months following withdrawal although no portion of that payment was made for Smith’s interest in the "good will” of B&J.
(12) The principal aspect of Smith’s compensation which is at issue here is the second component, his compensation for the period during 1990 prior to his withdrawal, i.e., the first eight months of 1990.
(13) At the time of Smith’s resignation, Smith tried to negotiate a settlement. At the time, he was told that he would have to be a part of the distribution process for fixing compensation, even though B&J negotiated settlements with at least four of the six partners who left B&J during the time Smith was a partner.
(14) At all relevant times, B&J has had law offices staffed by B&J partners in New York, New Jersey, Washington D.C. and London, England.
(15) All partners from all offices participate in the compensation process.
(16) B&J operates on a calendar year basis. B&J’s custom and practice dictate that yearly (approximately every February) all partners receive a compendium of the firm’s financial information compiled by the administrative partner, White, which contains financial information. Thereafter, each partner (from all offices) submits to the Distribution Committee his or her compensation recommendations for all the partners in all offices and then participates in a subsequent interview.[2] The Distribution Committee then fixes compensation.
(17) Principal among the financial information contained in the financial compendium upon which the partners from all the Brown & Jones offices base their compensation recommendations are the following six items: (1) fees and retained income, (2) profitability, (3) division of fees by time worked on matters, (4) division of fees between billing partner’s one third *16 and working partner’s two thirds, (5) division of fees between billing partner’s 10% and working partners 90% and (6) partner hours and time charges.
(18) The most important factor, considered to be most significant with respect to recommending compensation, is fees and retained income, often equated with fee generation.

Provincial Bank of Western Canada

(19) In the summer of 1989, Smith cultivated and developed a relationship with the Provincial Bank of Western Canada (PBWC) where the brother of a first-year associate (at the time, not yet admitted to practice law), Matthew Johnson, worked as a loan officer. At Smith’s prompting, Matthew Johnson invited his brother, Michael Johnson, to have lunch with Smith. Smith proposed to act as counsel for PBWC in a capacity for which PBWC did not previously retain counsel. Michael Johnson, Matthew Johnson’s brother, thereafter arranged a lunch at Smith’s prompting among James Black, the vice-president and chief credit officer at PBWC (the most senior person at PBWC with whom anyone at B&J dealt).
(20) During the first lunch with Matthew Johnson and Michael Johnson, Smith persuaded Michael Johnson to send a small matter to him for which he proposed to perform legal services at a discount. On this matter, Smith reviewed loan participation documents and made a number of suggestions to Michael Johnson. Matthew Johnson performed no legal services in connection with this matter. PBWC was billed approximately $2,000 for that matter. Thereafter, Michael Johnson set up the lunch with James Black. At that lunch, Black mentioned that he was having problems collecting for some damage incurred in a recent move. After writing a complimentary lawyer’s letter, Smith achieved a favorable result for Black. Meanwhile, PBWC sent over a second matter, another loan participation review, on which Smith again performed legal services. After the successful result reached in Black’s personal matter, and Smith’s work on the two loan participation matters (the second of which was the first matter for which Matthew Johnson performed legal services), PBWC sent Smith the first matter for which it was the originating bank.

Provincial Bank of Western Canada Was A "Smith Client” Not A "Firm Client”

(21) In the compendium of financial information distributed among the partners in connection with fixing compensation in *17 1989, Smith was credited with originating $59,541 in fees for Provincial Bank of Western Canada.
(22) Conversely, in the 1990 financial compendium, Smith was given no credit for PBWC. In an unprecedented maneuver, B&J created a "Firm Client” list — a few days after Smith’s departure — a designation never previously used, and made PBWC a "Firm Client,” giving no credit to Smith for the more than $475,000 in fees B&J earned from PBWC in 1990.
(23) All new B&J matter memoranda, including the initial one, list Smith as the billing attorney and administrative partner for PBWC. Three B&J partners on the billing committee signed off on each of these new matter memoranda. As the billing and administrative partner, Smith was the attorney who was the contact attorney for B&J.[3]
(24) Moreover, no new matters were sent to B&J by PBWC after Smith left. Major matters were transferred to other firms.
(25) Accounting reports dated as of August 24, 1990, one week prior to Smith’s departure, demonstrate that Smith was credited through that date with the origination of fees received of $249,314.04 for PBWC (excluding disbursements).
(26) At the time of his withdrawal, Smith had also sent out bills (which were not paid prior to his withdrawal) totalling between $50,000 and $70,000.
(27) Certain checks received by B&J from PBWC contain accounting notations which indicate that Smith was the partner to be given billing and origination credit for such fees.
(28) The total fees generated by PBWC for the year 1990 was $475,090.
(29) Smith performed legal services in connection with approximately 14 different matters for PBWC and, prior to his resignation effective August 31, 1990, was responsible for generating approximately $380,000 (including receivables and work in process at the time of his departure) of the total $475,090 in fees in 1990.

The Writing Exercise

(30) Although he asked, and although a partner for eight months, Smith was excluded from participation in the 1990 writing exercise.
(31) Although he asked, Smith was precluded from reviewing plaintiff’s writing exercise in its entirety during the B&J compensation process, and was instead given only three pages.
*18 (32) In February 1991 Smith received a letter from Alan White (White), a member of the Distribution Committee and the administrative partner, which had three attachments: a list of clients for which Smith received billing and origination credit; a list of clients under the title "Firm Clients” and his profitability analysis.
(33) Prior to the year of Smith’s withdrawal, there had never before been a "Firm Client” category in connection with the compensation process at B&J.
(34) The decision by B&J to form a "Firm Client” category was made at or just after the time of Smith’s departure.
(35) Such decision was not put to a vote of the partnership.
(36) PBWC was listed as a "Firm Client” and not a "Smith Client”, as it had been in the past. Thus Smith was denied billing credit for it. As a result, Smith’s fee generation and profitability analysis as well as his numbers in the other categories listed in the financial compendium were much lower than they should have been.
(37) In the beginning of March 1991, Smith had a telephone conference with the B&J Distribution Committee in connection with its fixing of Smith’s compensation for the year 1990.
(38) At that time Smith conveyed his opinion that it was wrong that PBWC was characterized not as a "Smith Client” but as a "Firm Client”.
(39) Although Smith’s February 28,1991 letter to Alan White outlining this position was circulated among the partners, this circulation happened at the conclusion of the compensation process, well after it had been distributed among the partners, after all of the partners had submitted their written recommendations for Smith and just prior to the partner interviews with the Distribution Committee.
(40) A chart analyzes Smith’s placement among the other partners. It also shows where his placement would have been had he received billing and origination credit for the fees for PBWC and compares that with what actually happened, i.e., he was denied credit for these fees. The chart demonstrates that Smith would have been ranked second for profitability if credited with PBWC’s fees; without such fees he was sixth. The other numerical factors include fees and retained income; division of fees between billing one third and working partners *19 two thirds; and division of fees between billing (10%) and working (90%) partners.[4]
(41) Other partners at B&J are given billing and origination credit for clients which were originally introduced to B&J by other partners, former partners or associates. These clients, in contrast to PBWC, however, are not classified as "Firm Clients”. (See, e.g., "White Client List” [Simpson, Davis and Allied Network]; "Olson Client List” [Allied Network, Canton Exchange Bank]; "Ford Client List” [Simpson Estate and Evans]; "Lucas Client List” [Benefits Concepts].)
(42) It was also fatally flawed because B&J instructed its partners that "Recommendations for KFS should be for the eight months he was partner during 1990.”
(43) There is no question but that B&J partners understood this as a direction to recommend two thirds of the number they would have otherwise recommended.
(44) Thus, although 98% of all of his fees were billed by Smith at the time of his withdrawal, the B&J partners were instructed to recommend that he be compensated for only two thirds of his 1990 contribution to B&J.
(45) Smith was also improperly charged expenses for a full year, although his withdrawal was effective August 31, 1990. For those clients Smith left behind at B&J, he was charged with a full year of expenses associated with associate and paralegal use.
CONCLUSIONS OF LAW
(1) Implicit in all contracts is an obligation of good faith and fair dealing. Implicit in that obligation is that no party will do anything to destroy or injure the right of another party under *20 the contract. The covenant of good faith and fair dealing precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement (see, Birnbaum v Birnbaum, 73 NY2d 461, 466 [1989]; Wilf v Halpern, 194 AD2d 508 [1st Dept 1993]).
(2) As part of the partnership’s obligation of good faith dealing with each of the partners including plaintiff, the court can consider the self-interest of the partnership in assigning an artificially low value to a departing partner’s share. In this regard, the case of Starr v Fordham (420 Mass 178, 648 NE2d 1261 [1995]) is persuasive. In that case, the Supreme Judicial Court of the Commonwealth of Massachusetts upheld a judgment against a partnership law firm holding that the court could consider the partnership’s self-dealing and self-interest in allocating the firm’s profits since the percentage of profits assigned to the departing partner had a direct impact on the remaining partners’ share of the firm’s profits.
While this court recognizes that the term "fair share” can impart discretion to a management committee (see, Rutkowski v Hill, Betts & Nash, 206 AD2d 258 [1st Dept 1994]), this discretion should be exercised in light of the obligation to deal fairly and equitably with a partner (see, Ellenberg Morgan Corp. v Hard Rock Cafe Assocs., 116 AD2d 266 [1st Dept 1986].)
(3) The Distribution Committee’s decisions to (1) deny Smith a role in the writing exercise for 1990, both by refusing to give Smith a copy of the materials and by refusing to give Smith an opportunity to make recommendations with respect to all B&J partners; (2) create a new category of firm clients where one had never existed before without putting it to a vote of the partnership; (3) recharacterize PBWC as a firm client thereby depriving Smith of his largest billing client; (4) charge Smith for a full year of expenses; (5) refuse to attempt to settle with Smith in good faith, in keeping with B&J’s custom and practice; and (6) direct the B&J partners to compensate Smith for two thirds of his 1990 contribution deprived Smith of the benefits of the Partnership Agreement to which he was entitled. Such deprivation constitutes a violation of the covenant of good faith and fair dealing as well as a violation of the stated terms of the Partnership Agreement because it denies Smith compensation for the services he provided to B&J prior to his departure.
(4) Every partner is accountable as a fiduciary to every other partner (Partnership Law § 43). Smith’s former partners at B&J are fiduciaries with respect to any transaction connected *21 with the conduct of the partnership or its use of its property (Partnership Law § 43).
(5) A contract should be given a fair and reasonable interpretation based upon its language, in light of the purposes sought to be attained by the parties. An unreasonable interpretation or an absurd result should be avoided (see, Burke v Clifton, Budd & DeMaria, 214 AD2d 414 [1st Dept 1995] [referee’s report issued by Donald Diamond, special referee in evidence]; Farrell Lines v City of New York, 30 NY2d 76, 82-83 [1972]).
(6) Partners owe each other a duty of undivided and undiluted loyalty (see, Birnbaum v Birnbaum, supra). The fiduciary duty owed among partners is utmost good faith, fairness and loyalty (see, Wilf v Halpern, supra).
(7) The partners of B&J held the partnership profits as trustee. They are fiduciaries with respect to any transaction connected with the conduct of the partnership. By failing to include Smith in the writing exercise or to distribute to him his fair share of partnership profits, B&J has breached its fiduciary duty to Smith (see, Wilf v Halpern, supra).
(8) B&J had an obligation to turn over all information pertaining to the partnership’s finances. (Partnership Law § 42.) B&J breached Partnership Law § 42 by failing to give Smith all the financial information contained in the writing exercise when Smith asked for it and when he asked to be made a part of the writing exercise.
(9) B&J, the party violating its contract, " 'should not be permitted entirely to escape liability because the amount of the damage which [it] has caused is uncertain’ ” (Manshul Constr. Corp. v Dormitory Auth., 111 Misc 2d 209, 224 [Sup Ct, Kings County 1981] [citing Wakeman v Wheeler & Wilson Mfg. Co., 101 NY 205, 209 (1886); Novak & Co. v Facilities Dev. Corp., 116 AD2d 891 [3d Dept 1986]). Thus, any uncertainty attributable to B&J’s wrongful conduct should not prejudice Smith’s recovery.
(10) Smith’s total compensation for the year 1990 should have been set commensurate with his contribution to B&J. As Smith testified, this range is between $318,000 and $335,000. In any case, his compensation could be set no lower than $305,000 because Smith’s numbers fell between those of 01- *22 son’s and Simmons’ (but closer to Olson’s).[5] Olson earned $310,000 and Simmons earned $269,000. Smith’s compensation for 1990 then can be fairly assessed at $326,500 (or midway between $318,000 and $335,000). Smith’s total damages then would be fixed at $192,500 or $326,500 less $134,000, plus interest. This range is based upon the numbers and information contained in the profitability analysis distributed as part of plaintiffs exhibits and Smith’s own testimony.[6] Smith’s damages, thus, are $192,500.[7]
DECISION
(1) Plaintiff, Kevin F. Smith, is granted judgment in the sum of $192,500 with interest at the rate of 9% from January 1, 1991, taxable costs and disbursements and the Clerk shall enter judgment accordingly.[8]

. Partners from different offices had little else to judge other partners’ performances but by the numbers. Even partners from the same office had scant knowledge regarding a partner’s relationship with his/her clients. Thus, any change in Smith’s numbers would have necessarily had a significant impact upon how other partners viewed his performance and thus his compensation.

. At no time during B&J’s relationship was Matthew Johnson ever the contact at B&J for PBWC.

. Had Smith been credited with PBWC fees, his fee generation credit would have fallen between partners Olson and Williams who earned $310,000 and $209,000, respectively. The chart also demonstrates that Smith’s profitability would have been ranked second between Carey and Ford who earned $485,000 and $240,000, respectively. Moreover, Smith placed above Lucas in all categories, except billable hours, where he recorded in eight months just over 100 hours fewer than Lucas recorded for the full year, even without PBWC, yet Lucas earned $189,000, nearly $60,000 more than Smith who was given only $134,000.
Had B&J settled with Smith on the same terms upon which it settled with former B&J partners, Messrs. Meyers and Gilbert, Smith would be entitled to collect 35% of fees received by Smith’s clients, including PBWC; then Smith would be entitled to 35% of $913,450 or $319,707.50. Additionally, Smith would also have received 22% of his time charges on clients for which he was not the billing partner.

. Indeed, if the court finds that B&J acted improperly in withholding the compendium of financial information from Smith, and that it was improper to have subjected him to the B&J compensation process at all, the court may apply the same formula to Smith as B&J applied to two of the partners who withdrew from B&J during Smith’s tenure there, i.e., 35% of Smith’s total billings, including PBWC, and 22% of the hourly charges for clients for which others were the billing partners and award Smith $335,000.

. This amount excludes, however, any interest Smith had in the good will of B&J.

. In addition, because Smith will be taxed on his damages, at 1995 rates rather than at 1990 rates, he will be required to pay substantial additional income taxes as a result.

. Pursuant to a prior order of this court, this decision and file shall remain under seal to be opened only by order of this court.