Reggie WHITE, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty–Niners, Ltd.; The Seattle Seahawks, Inc.; Tampa Bay Area NFL Football Club, Inc.; and Pro–Football, Inc.; Defendants.

Civil No. 4–92–906.

United States District Court, D. Minnesota, Fourth Division.

July 30, 1997.

Edward M. Glennon, Lindquist & Vennum, Minneapolis, MN, James W. Quinn, Jeffrey L. Kessler, David G. Feher, Weil, Gotshal & Manges, New York City, for plaintiffs.

Daniel J. Connolly, Faegre & Benson, Minneapolis, MN, Gregg H. Levy, Covington & Burling, Washington, D.C., Frank Rothman, Shepard Goldfein, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

DOTY, District Judge.

This matter is before the court on plaintiffs' appeal from the decision of the Special Master dated May 30, 1997. Based upon a review of the file, record and proceedings herein, and for the reasons stated below, the court reverses the decision of the Special Master.

## BACKGROUND

Class Counsel and the National Football League Players' Association ("NFLPA") appeal from two related contract disputes involving the "circumvention" provisions of Article XV(2) of the Stipulation and Settlement Agreement ("SSA") and Article XXV, § 2 of the National Football League ("NFL" or "League") Collective Bargaining Agreement ("CBA").

The first dispute concerns the renegotiation of Billy Joe Hobert's Player Contract with the Buffalo Bills. Hobert has been a quarterback in the NFL since 1993. Prior to the commencement of the 1996 League Year, he signed a four-year Player Contract with the Oakland Raiders which obligated him to play for the Raiders through the 1999 League Year. Hobert was paid a $700,000 Signing Bonus by the Raiders. After com-

pleting the first year of his contract, the Raiders traded Hobert to the Bills and Hobert became obligated to play for the Bills for the 1997–1999 League Years. The Bills and Hobert agreed to renegotiate his Player Contract for the 1997–1999 League Years as follows:

| Year | Current Compensation | | Renegotiated Compensation | |
|------|----------------------|--|---------------------------|--|
| 1997 | Paragraph 5: | $ 760,000 | Paragraph 5: | $ 235,000 |
|      | Signing Bonus: | $0 | Signing Bonus: | $ 525,000 |
| 1998 | Paragraph 5: | $1,250,000 | Paragraph 5: | $1,250,000 |
| 1999 | Paragraph 5: | $1,500,000 | Paragraph 5: | $1,490,000 |

Paragraph 5 compensation, or base salary, is the compensation set forth in paragraph 5 of a NFL Player Contract. Paragraph 5 compensation is not guaranteed, and is paid in weekly installments over the playing season. CBA Art. I, § 3(ao). Thus, under the terms of the original contract with the Raiders, it is possible that Hobert's 1997 earnings could be substantially less than $760,000. In contrast, under the renegotiated contract, Hobert would be paid a $525,000 Signing Bonus immediately. The remaining $235,000 of the $760,000 would be paid as Paragraph 5 compensation and disbursed to Hobert throughout the 1997 season. Hobert would also receive $10,000 less during the 1999 League Year under the restructured contract.

Generally, Signing Bonuses are prorated over the full term of a Player Contract. SSA Art. X(G)(2)(a); CBA Art. XXIV, § 7(b)(I).[1] However, Paragraph 5 compensation is included in Team Salary by the NFL Clubs "in the year earned." SSA Art. X(G)(1)(a); CBA Art. XXIV, § 7(a)(I). The following summary illustrates the effect the proposed restructuring of Hobert's contract would have on the Bill's Salary Cap:

| Year | Amount Hobert's Current Contract Would Add to the Bills' Salary Cap | Amount Hobert's Renegotiated Contract Would Add to the Bills' Salary Cap |
|------|-------------------------------------|-------------------------------------|
|      | Current Cap Dollars | Renegotiated Cap Dollars |
| 1997 | $760,000 | $5B410,000 |
| 1998 | $1,250,000 | $1,425,000 |
| 1999 | $1,500,000 | $1,650,000 |

Under Hobert's original contract, the entire $760,000 to be paid for his 1997 services would be counted against the Bills' 1997 Salary Cap. Under the proposed renegotiated contract, and in accordance with the SSA proration rules, only $410,000 ($235,000 of Paragraph 5 compensation plus $175,000 of Signing Bonus) would be counted against the Bills' 1997 Salary Cap. The remaining $350,000 of the proposed $525,000 Signing Bonus would be prorated over the 1998 and 1999 League Years.

For Hobert, the proposed renegotiation provides him with at least two benefits. First, he would be guaranteed $525,000 for his services during the 1997 League Year. Second, the Signing Bonus would function as an incentive for the Bills to keep him on their team roster for the full term of his contract. If Hobert were released early, the Bills' Salary Cap recognition of the $525,000 Signing Bonus would be accelerated to the then-current League Year. SSA Art. X(G)(2)(b); CBA

1. Citations to both the SSA and the CBA are provided. The court notes that in cases where the SSA and CBA conflict, the *White* settlement agreement prevails. CBA, Art. II, § 1. Neither party has argued that such a conflict exists as to the issues before the court.

Art. XXIV, § 7(b)(ii). If Hobert remains with the Bills through the 1999 League Year, however, the $525,000 Signing Bonus would count against the Bills' Salary Cap pro rata through the 1999 League Year. The renegotiation would also provide the Bills with an additional $350,000 of Salary Cap Room which could be used to sign other football players in 1997. By shifting the recognition of compensation to be earned by Hobert in 1997 to later years for Salary Cap purposes, however, the Bills would have $175,000 less to spend on other players during the 1998 and 1999 League Years because $350,000 of Hobert's Signing Bonus would be prorated over those League Years.

The National Football League Management Council ("NFLMC") informed the Bills' management that they could not agree to the proposed renegotiation of Hobert's contract unless Hobert agreed to extend his Player Contract for an additional year. The NFLMC asserted that the proposed renegotiation violated the "circumvention" provisions of the SSA and CBA.

The second dispute involves Elvis Grbac, another quarterback who recently signed a five year Player Contract with the Kansas City Chiefs. Under the terms of his Player Contract, Grbac would receive a $3,500,000 Signing Bonus which the Chiefs would prorate over the full term of the contract. The fifth year of the contract, the 2001 League Year, is voidable at Grbac's option upon the occurrence of the following events:

1. If the Player is on the Active/Inactive 53–man roster, the PUP, NFI, IR or any other employment or league list (except Reserve/DNR, Reserve/left squad) for the last game of the 2000 NFL season.

**AND**

2. Any of the following contingencies are met during 1997, 1998, 1999 or 2000 NFL regular seasons.

A. Player participates in at least 20% of the team's offensive plays, exclusive of special team plays in any single season.

B. Player passes for at least 800 yards in any single season.

C. Player completes as least 9 or more touchdown passes in any single season.

D. Player's QB rating is at least 73 in any single season.

D. Club qualifies for post-season play in any single season.

**THEN**

Player has the express right to terminate (void) his contract for the year 2001 within 30 days subsequent to the last game of the 2000 regular season. Player must notify the club of his right to terminate the 2001 contract by fax, personal delivery, or certified mail to club's president or general manager.

Both the Chiefs and Grbac agreed to this contractual provision, under which Grbac's $3,500,000 Signing Bonus would be prorated over the five year term of the contract adding $700,000 to the Chiefs' Team Salary in each of the 1997–2001 League Years.

The NFLMC informed the Chiefs and Grbac that the Signing Bonus could not be prorated over the fifth "voidable" year of the Player Contract unless Grbac agreed to certain changes. The NFLMC asserted that the Chiefs could prorate Grbac's Signing Bonus only over the first four years of the contract at a level of $875,000 because it was likely that Grbac would earn the right to terminate his contract in the fifth year. The NFLMC offered the Chiefs the opportunity to prorate the signing bonus over the full term of the contract if Grbac agreed to changes would make it more unlikely that he would earn the right to terminate his contract during the fifth and final year. If Grbac accepted the NFLMC's proposed changes, the Chiefs would have $175,000 less to sign other players during each of the 1997–1999 League Years, and Grbac would lose the unilateral right to terminate the contract in the fifth year based upon events not within his sole control. Grbac refused to agree to the NFLMC's proposed changes.

Class Counsel and the NFLPA sought a ruling by the Special Master that the Hobert renegotiation and Grbac contract did not violate the "circumvention". provisions in the

SSA and CBA. Both disputes were fully briefed, and a hearing was held before Special Master Friedenthal on April 16, 1997. On May 30, 1997, the Special Master issued his decision and denied the relief requested by Class Counsel and the NFLPA. He concluded that the Hobert renegotiation and Grbac contract circumvented the intent of the parties to the SSA. This timely appeal followed.

## DISCUSSION

Before reaching the merits of this appeal, the court must address two threshold issues raised by the NFLMC: the court's jurisdiction and standard of review.

### I. Jurisdiction

■ The NFLMC argues that the Supreme Court's recent decision in the case of *Brown v. Pro Football, Inc.*, —— U.S. ——, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) undermines the court's jurisdiction over this appeal. The court will make quick work of this challenge to its jurisdiction. In the final judgment, the court retained jurisdiction to enforce the terms of a class action settlement agreement which it approved—pursuant to Fed.R.Civ.P. 23. The court's jurisdiction is based on the "well-established principle that a trial court retains jurisdiction to enforce consent decrees and settlement agreements." *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C.Cir.1993) (citations omitted). Article XX of the SSA provides that "the Court shall retain jurisdiction over this Action to effectuate and enforce the terms of this Agreement and the Final Consent Judgment." Unless and until the Final Consent Judgment is modified, the court has the power to enforce the terms of the SSA.

### II. Standard of Review

■ The NFL also contends that because the terms of the SSA, including the Circumvention provision, are ambiguous, the proper standard of review is the clearly erroneous standard. Class Counsel and the NFLPA urge the court to conduct a de novo review of the Special Master's decision. The SSA provides in relevant part:

2. The powers of the Court and the Special Master and the rights of the parties in any enforcement proceedings shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

. . . . .

(b) The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of law, or abuse of discretion; except that, as to any finding concerning Article XXVII (Anti–Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

(c) Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance; . . . .

SSA Art. XXII(2); CBA Art. XXVI, § 2. The Special Master's factual findings are reviewed under the clearly erroneous standard, subject to certain exceptions not relevant to this appeal. Conclusions of law are reviewed de novo.

■ When a contract is construed according to its terms and without reliance on extrinsic evidence, its interpretation is a question of law subject to plenary review. *Frank B. Hall & Co. v. Alexander–Alexander, Inc.*, 974 F.2d 1020, 1023 (8th Cir.1992). Under New York law, which governs the SSA and CBA's construction and interpretation, determining whether a contract is ambiguous and interpreting an unambiguous contract are also questions of law. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990). If the meaning of a contract is ambiguous, then parole or extrinsic evidence may be considered to ascertain the intent of the parties. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (applying New York law). When extrinsic evidence is considered, the meaning of a contract generally becomes a factual determination. *Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 897, 305 N.E.2d 907, 909 (1973).

■ "A purported ambiguity does not automatically raise an genuine issue of material fact." *Realex Chemical Corp. v. S.C. Johnson & Son, Inc.*, 849 F.2d 299, 302 (8th Cir.1988). Indeed, "[i]t is the rare writing that requires no interpretation[.]" *Bensons Plaza v. Great Atlantic & Pacific Tea Co., Inc.*, 44 N.Y.2d 791, 406 N.Y.S.2d 33, 34, 377 N.E.2d 477, 478 (1978), *rev'd on other grounds*. The New York Court of Appeals has articulated the following well-established principles:

> [I]t is the [responsibility] of the court to interpret written instruments.... This is obviously so where there is no ambiguity....
>
> If there is ambiguity in the terminology used, however, and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such a determination is made by the jury.... On the other hand, if the equivocality must be resolved wholly without reference to extrinsic evidence the issue is to be determined as a question of law for the court.

*Wesolowski*, 350 N.Y.S.2d at 897, 305 N.E.2d at 909. To the extent that a court can resolve an ambiguity without resort to extrinsic evidence, the court is deciding a question of law. *Id.*

In his decision, the Special Master did not state whether he considered the SSA ambiguous or not. There is nothing in the record which indicates that he relied upon parol or extrinsic evidence in interpreting the SSA, however. Indeed, he was precluded from relying on such evidence in rendering his decision because the SSA provides that "[t]he parties shall not, in any proceeding ... use or refer to any parol evidence with regard to the interpretation or meaning of ... this Agreement." SSA Art. XXX(7); CBA Art. LV, § 19. Thus, by the parties' agreement, the Special Master's decision was restricted to interpreting the language used in the SSA as a matter of law without recourse to any extrinsic evidence regarding the parties' in-

tent. Accordingly, the court reviews the Special Master's decision de novo.[2]

### III. The Circumvention Rule

The Circumvention provision of the SSA and CBA provides:

> Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the *parties* as reflected by (a) the provisions of this Agreement with respect to the Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. *However, any conduct permitted by this Agreement shall not be considered a violation of this provision.*

SSA Art. XV(2); CBA Art. XXV, § 2 (emphasis added). The broad issue before the court is whether conduct which is permitted by the SSA can violate the Circumvention rule? With the issue so framed, the conclusion becomes readily apparent. The narrow issues presented by the facts of the Hobert and Grbac disputes concern the payment and proration of Signing Bonuses. The Hobert dispute presents the issue of whether a Player Contract that is restructured to decrease Paragraph 5 compensation and to increase a Signing Bonus without being extended constitutes "circumvention." The Grbac dispute presents the issue of whether it is "circumvention" for a Signing Bonus to be prorated, for Salary Cap purposes, over a year of a Player Contact that is voidable by the player based upon events which are not within the player's "sole control" even though such a right is "likely to be earned."

■ Both the SSA and CBA are governed by New York law. The well-settled New York law articulated by this court in the 30% Rule proceeding is fully applicable to these disputes. As the court previously made clear:

---

2. The court notes that the NFLMC's argument that the clearly erroneous standard is applicable because the circumvention provision of the SSA is ambiguous, as evidenced by the parties "divergence of opinion" on this issue, is significantly undercut by the court's previous application of the de novo standard of review to vigorously contested 30% Rule dispute. *See White, et al. v. NFL, et al.*, 899 F.Supp. 410, 413–14 (D.Minn. 1995).

Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (1985). The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed. *Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d [169] 171–72, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973) (quoting 4 S. Williston, *A Treatise on the Law of Contracts* § 600, at 280 (3d ed.1961)). The court should also give the words in a contract their plain and ordinary meaning unless the context mandates a different interpretation. *See Laba v. Carey,* 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641, *mot. for rearg. den.,* 30 N.Y.2d 694, 332 N.Y.S.2d 1025, 283 N.E.2d 432 (1971).

. . . . .

Moreover, a court may not rewrite into a contract conditions the parties did not insert or, under the guise of construction, add or excise terms. *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (1985).

*White, et al., v. NFL, et al.,* 899 F.Supp. 410, 414, 415 (D.Minn.1995). With these principles at hand, the court turns to the relevant portions of the SSA.

## A. Hobert Dispute

The rules governing the renegotiation and extension of Player Contracts provide in relevant part:

### I. Renegotiations and Extensions

Provided that all Salary Cap requirements are met, Player Contracts *for current and future years may be renegotiated and/or extended as follows:*

1. The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract negotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

2. No Salary and player may agree to renegotiate any term of a previously signed Player Contract for a *prior League Year.*

3. No contract renegotiations may be done for a *current season* after the last regular season game of that season.

4. A Player Contract signed by a Rookie may not be renegotiated except as provided in Article V (Entering Player Pool), paragraph 2.

5. As provided in Article IX (Final Eight Plan), paragraphs 3 and 4.

SSA Art. X(I); CBA Art. XXIV, § 9 (emphasis added).

"Renegotiate" is defined as "any change in the Salary or the terms under which such Salary is earned or paid[.]" SSA Art. I(al); CBA Art. I, § 2(ab). "Salary" is defined as "any compensation of money, property, investments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player . . . during a League Year, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)." SSA Art. I(v); CBA Art. I, § 1(k).

The SSA also contains rules to determine the amount of a player's salary that is to be included in a Club's Team Salary in a particular League Year for purposes of the Salary Cap. Paragraph 5 Salary is "included in Team Salary in the year earned." SSA Art. X(G)(1); CBA Art. XXIV, § 7(a)(I). In contrast, "[t]he total amount of any Signing Bonus shall be prorated over the term of the Player Contract in determining Team and Player Salary," subject to certain exceptions no relevant here. SSA Art. X(G)(2)(a); CBA Art. XXIV, § 7(b)(I). For purposes of determining Team Salary, the term "Signing Bonus" is broadly defined as:

(I) *any amount specifically described in a Player Contract as a signing bonus;*

. . . . .

(iii) *any consideration, when paid, or guaranteed,* for option years, contact extensions, *contract modifications,* or individually negotiated rights of first refusal[.]

SSA Art. X(G)(2)(d); CBA Art. XXIV, § 7(b)(iv) (emphasis added).[3]

■ By setting out in detail the relevant provisions of the SSA, the court's analysis becomes straightforward. The plain and unambiguous language of the relevant portions of the SSA permit a Player Contract to be restructured to decrease Paragraph 5 compensation and to increase a Signing Bonus for the then-current League Year without being extended. The SSA expressly states that "Player Contracts for current and future years may be renegotiated and/or extended." SSA Art. X(I); CBA Art. XXIV, § 9.[4] By employing the disjunctive "or," the SSA makes clear that a player may renegotiate and extend his contract, or renegotiate his contract without extending it. Furthermore a Signing Bonus, which is included as part of a player's salary, *see* SSA Art. I(v); CBA Art. I, § 1(k), may be paid for a contract modification. *See* SSA Art. X(G)(2)(d); CBA Art. XXIV, § 7(b)(iv). Thus, renegotiating, without extending, a Player Contract to include a Signing Bonus for the then-current League Year is permitted under the SSA and therefore does not constitute circumvention.

The Special Master found correctly that the Circumvention provision permits renegotiations provided all Salary Cap requirements are met. However, he concluded that the renegotiated Hobert contract circumvented the intent of the parties. This conclusion is based on the Special Master's erroneous determination that the Circumvention provision is a Salary Cap requirement.[5] It is not. The Circumvention provision is simply a mechanism to enforce the Salary Cap rules. The Salary Cap requirements referred to in Article X of the SSA makes clear that under the Salary Cap rules, the club must have the necessary Salary Cap Room to enter into the renegotiated Player Contract.

The NFLMC claims that a Signing Bonus cannot be paid for a contract renegotiation because it is commonly understood that "[s]igning bonuses are paid to induce a player to enter into a new contractual relationship." Defs.' Mem. at 12 (emphasis in original). This argument ignores the plain language of the SSA which does not define Signing Bonus as it may be commonly understood. Rather, a Signing Bonus is broadly defined as "[a]ny amount specifically described in a Player Contract as a Signing Bonus" or "[a]ny consideration, when paid, . . . , for . . . , contract modifications." SSA Art. X(G)(2)(d); CBA Art. XXIV, § 7(b)(iv). As part of the renegotiation, Hobert and the Bills specified that Hobert would be paid a $525,000 Signing Bonus. The characterization of that compensation meets the definition of a Signing Bonus under the SSA and the $525,000 can therefore be fully prorated.

The NFLMC also somewhat disingenuously complains that the proposed modification is a "sham renegotiation" to manufacture "bogus Salary Cap Room." It goes without

---

3. The court has previously found that under the SSA, "modification" of a Player Contract encompasses "renegotiation" of a Player Contract. *White, et al., v. NFL, et al.,* 899 F.Supp. 410, 415 (D.Minn. 1995).

4. The court notes that in contrast to the parties' ability to renegotiate the terms of a Player Contracts for current and future League Years, the SSA prohibits the renegotiation of Player Contracts for prior League Years and the current League Year after the last regular season game of that season. SSA Art. X(I); CBA Art. XXIV, §§ 9(b) and (c).

5. The Special Master also questioned the adequacy of the consideration offered by Hobert in exchange for the renegotiated Player Contract. It would be improper for the Special Master or this court to add terms or consideration requirements to the SSA. It is our obligation to enforce the SSA, not rewrite it.

Under the proposed renegotiation, Hobert would receive a guaranteed $525,000 Signing Bonus and the benefit of the time value of money. He would forego $10,000 in 1999, however. The Bills would receive $350,000 of Salary Cap Room in the 1997 League Year, but would give up Salary Cap Room in later League Years. The NFL pejoratively described this consideration as "bogus." Even assuming that some consideration were required to renegotiate a Player Contract, the proposed renegotiation is supported by sufficient consideration under New York law. *See, e.g., Wetner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 197, 443 N.E.2d 441, 445 (1982) ("[T]he value or measurability of a thing forborne or promised [as consideration] is not crucial so long as it is acceptable to the promisee. Thus, the courts have not hesitated to find sufficient consideration . . in what is now known as the proverbial peppercorn . . . .") (internal citation and quotations omitted).

saying that the parties to the SSA may justifiably rely on its terms to maximize their respective economic and competitive interests. *See, e.g., White, et al. v. NFL, et al.,* 899 F.Supp. 410 (D.Minn. 1995) (30% Rule proceeding). It is neither the role of the Special Master nor the court to sit in judgment of the economics of professional football, nor to second-guess the wisdom of the bargain the parties struck. The proposed renegotiation of the Hobert Player Contract is explicitly authorized under the terms of the SSA and therefore does not circumvent the intent of the parties.

## B. Grbac Dispute

█ At issue in the Grbac dispute is whether a Signing Bonus may be prorated over a contract year which the player has the right to void based upon events not within his sole control. As stated previously, under SSA rules a Signing Bonus is generally prorated over the term of the Player Contract to determine Team Salary for a given League Year. There is a single exception to this general rule, however. The SSA provides that:

> (ii) Any contract year in which the player has the right to terminate *based upon events within his sole control shall not be counted as a contract year for purposes of proration.* In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control, such issue shall be resolved by the Impartial Arbitrator.

SSA Art. X(G)(2)(a)(ii); CBA Art. XXIV, § 7(b)(I) (emphasis added).

Thus, a Signing Bonus *may be prorated* over any contract year which the player *does not* have the right to terminate based upon events within his "sole control." In contrast, a Signing Bonus may *not be prorated* over a contract year which the player has the right to terminate based upon events within his sole control. SSA Art. X(G)(3)(a); CBA Art. XXIV, § 7(c)(I).

In the proceedings before the Special Master, the NFLMC did not argue that the performance contingencies in Grbac's proposed contract were within his "sole control." Neither of the parties requested that the Impartial Arbitrator resolve this issue. See SSA Art. X(G)(2)(a)(ii); CBA Art. XXIV,

§ 7(b)(I). Based upon undisputed facts, the Special Master found that Grbac did not have "sole control" over any of the player or team performance contingencies that had to occur before he could exercise the right to void the fifth year of his contract. The NFLMC does not challenge that finding.

Having found that Grbac's right to terminate the fifth year of his Player Contract was not within his "sole control," the Special Master should have ended his analysis by concluding that Grbac's proposed contract did not violate the Circumvention rule, and the Chiefs could prorate the Signing Bonus over the voidable year. Instead, the Special Master ignored the express language of the SSA, which permits a Signing Bonus to be prorated over a voidable contract year subject only to the "sole control" test, and concluded that the Grbac contract was "clearly outside of the intention of the parties" because the right was "likely to be earned," though not within Grbac's "sole control."

The SSA states that "[a]ny and all incentive amounts, included but not limited to performance bonuses, shall be included in Team Salary if they are 'likely to be earned' during such League Year." SSA Art. X(G)(3)(a); CBA Art. XXIV, § 7(c)(I). Any incentive "within the sole control of the player" is deemed "likely to be earned." *Id.* The SSA unambiguously states, however, that a Signing Bonus may not be prorated over a contract year only where the player reserves the right to terminate the contract based upon events that are within his sole control. The NFLMC concedes that the phrase "likely to be earned" does not appear in the relevant section of the SSA pertaining to the proration of Signing Bonuses. *See* Defs.' Mem. at 21 n. 20. Although the "likely to be earned" test may be more stringent and beneficial to the NFL than the "sole control" test, "sole control" is the bargained-for rule agreed to by the parties. *See Mahers v. Hedgepeth,* 32 F.3d 1273, 1274–75 (8th Cir. 1994) ("Because a consent decree reflects a compromise between hostile litigants its scope must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.") (internal citations and quotations omit-

ted). By employing different language in different sections of the SSA, it is clear that the parties recognized and understood the difference between "sole control" and "likely to be earned." Had the parties intended "likely to be earned" to be the test for the proration of Signing Bonuses over voidable contract years, they could have so agreed.[6]

## CONCLUSION

The Special Master characterized the Hobert renegotiation and Grbac contract as "technical ploys." However, the SSA is a product of lengthy and detailed negotiations. It is a carefully crafted document that contains numerous compromises, trade-offs and intricate rules. Sometimes the language of the SSA seems to favor one party to a substantial degree. It is not for the Special Master or the court to alter the results of the parties' compromise, however.

In conjunction with the rule barring the use of parol evidence, the Circumvention provision allows the parties to rely on the plain meaning of the SSA when structuring their contractual relationships. To reach his decision, the Special Master went outside of the agreement and substituted his judgment for the unambiguous language of the SSA. It is the Special Master's and the court's obligation to enforce the SSA as written.

The court has considered the NFLMC's remaining arguments and finds them unpersuasive. Based on the foregoing, the court concludes that the Hobert renegotiation and the Grbac contract are permitted under terms of SSA and the CBA, and therefore do not constitute circumvention. Moreover, neither Player Contract violates the good faith negotiation requirement of the SSA. Accordingly, the court reverses the Special Master's decision dated May 30, 1997.

---

**6.** The NFLMC attempts to avoid the conclusion that the proposed Hobert renegotiation and Grbac contract do not constitute circumvention by arguing that only conduct "expressly" permitted by the SSA does not circumvent the intent of the parties. The word "expressly" does not appear in the Circumvention provision, and the court will not imply a contract term the parties failed to employ.