Reggie WHITE, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty–Niners, Ltd.; The Seattle Seahawks, Inc.; Tampa Bay Area NFL Football Club, Inc.; and Pro–Football, Inc., Defendants.

No. CIV 4–92–906 (DSD).

United States District Court, D. Minnesota.

June 15, 2001.

Edward M. Glennon, Esq., Charles J. Lloyd, Esq. and Lindquist & Vennum, Minneapolis, MN, James W. Quinn, Esq., Jeffrey L. Kessler, Esq., David G. Feher, Esq. and Weil, Gotshal & Manges, New York City, Richard Berthelsen, Esq., General Counsel, NFLPA, Washington, D.C., for plaintiffs.

Daniel J. Connolly, Esq., Faegre & Benson, Minneapolis, MN, Gregg H. Levy, Esq. Neil K. Roman, Esq., Covington & Burling, Washington, D.C., Frank Rothman, Esq., Shepard Goldfein, Esq., Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the objections of class counsel and the National Football League Players' Association ("NFLPA") to the decision of Special Master Jack H. Friedenthal dated March 15, 2001. Based on a review of the file, record and proceedings herein, the court affirms the special master's decision.

## BACKGROUND

This case arises out of a proceeding commenced by class counsel and the NFLPA regarding the status of Kyle Richardson ("Richardson"), a punter for the Baltimore Ravens last season. Under the Collective Bargaining Agreement and the Stipulation and Settlement Agreement (hereafter collectively referred to as the "CBA"), a NFL player is entitled to become an Unrestricted Free Agent if he has four or more Accrued Seasons. *See* CBA Art. XIX § 1. The CBA further specifies that a player is credited with an Accrued Season if he was on full pay status for six or more regular season games. *See* CBA Art. XVIII, § 1(a).[1] Richardson has three Accrued Seasons in the NFL apart from his service in 1997.

In the 1997 season, Richardson was on full pay status with two different clubs during five weeks when those clubs engaged in regular season games. Additionally, he was on full pay status during a sixth week when the club that was paying him had a bye.[2] The special master deter-

---

1. The provision states as follows:

   For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for reach season during which he was on, or should have been on, full pay status for a total of six or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a non-football injury, or (iii) a Club's Practice or Development Squad.
   CBA Art. XVIII, § 1(a).

2. Richardson was on the roster for the Miami Dolphins on full pay status for the second

mined that Richardson was prevented from receiving a fourth Accrued Season, thereby denying him unrestricted free agency, since his team had a bye week during one of his qualifying weeks of full pay status for the six or more regular season games.[3]

The sole question that the special master addressed, now before this court, is whether the bye week, during which Richardson was on full pay status, counts as a "game" for purposes of defining an Accrued Season under the provisions of the CBA. Special Master Friedenthal concluded that the clear language of the CBA provides that a player will only be credited with an Accrued Season if he is on full pay status for a total of six or more regular season games in a given year and that games played by other NFL teams during a week in which a player's team has a bye cannot count toward the calculation of an Accrued Season. For the reasons stated, the court concurs with the special master and affirms his decision.

## STANDARD OF REVIEW

There are no facts in dispute in this matter. The parties agree that the standard of review is *de novo* since this appeal concerns the interpretation of the terms of the CBA. *See White v. NFL*, 899 F.Supp. 410, 413 (D.Minn.1995). Accordingly, this court must review the record and render a decision with no deference to the decision below.

## DISCUSSION

The parties do not dispute the relevant language of the CBA but rather its interpretation. The interpretation of the CBA is governed by New York law. *See White*, 899 F.Supp. at 413. As this court has previously stated:

> Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed. The court should also give the words in a contract their plain and ordinary meaning unless the context mandates a different interpretation.

*Id.* at 414 (citing New York law). Further, the court must give effect and meaning to every term of the contract, making every reasonable effort to harmonize all of its terms. *See Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 915, 649 N.Y.S.2d 555, 557 (N.Y.App.Div.1996). The contract must also be interpreted so as to effectuate, not nullify, its primary purpose. *See id.*

Class counsel argues that a player should be credited with a "game" under

---

regular season game, but was released after that game. The Dolphins then re-signed Richardson on September 18, 1997. He played for the Dolphins on September 21, the team had a bye week on September 28 and then Richardson played another game for the Dolphins on October 5, before being released by the team two days later. Richardson was then signed by the Seattle Seahawks on November 12, 1997, and played in two games for the Seahawks until he was released by that team on November 25, 1997. Thus, Richardson was on full pay status during five weeks in 1997 when his clubs played regular season

games and a sixth week when his club had a bye.

3. The NFL season consists of 16 games played in 17 weeks, with each team having at least one bye week. It is undisputed that this season existed in the NFL in 1993 when the CBA was written. It is further undisputed that the NFL unilaterally sets the schedule for bye weeks and that during a bye week a player on full pay status is entitled to receive one-seventeenth of his salary.

the definition of an Accrued Season when his team is on a bye week so long as he is on full pay status and there are other regular season games being played during that week. In other words, they believe that CBA Art. XXVIII, § 1(a) should be interpreted to read as "six or more *weeks* during the regular season." To support this position, class counsel points out that a player on a team with a bye week is still required to practice and is still entitled to receive 1/17th of his regular season salary. Class counsel also argues that there are other instances in the NFL's Constitution and Bylaws where a "week" is treated as a "game." [4]

The court, however, is unpersuaded by this argument. The court acknowledges that there is no explicit guidance as to whether the regular season games referred to in this provision are limited to games played by the player's team or whether this provision should be interpreted to encompass the period of time in which the player is on full pay status and regular season games are being played regardless of whether the player's team has a bye week. However, the court agrees with the special master's conclusion that the language here, in specifying "six or more regular season *games*," contemplates a certain level of participation or readiness to participate. [Emphasis added.] That is, the choice of the word "games" must be construed to denote its plain and obvious meaning. If the parties intended that only the number of *payments* or the number of *weeks* that games were played in the league were to be used to calculate an Accrued Season, it would

have been more logical for the parties to simply draft the provision to require "six or more payments" or "full pay status for six or more weeks." This provision does not state "weeks" or "payments," but "games." The court may not rewrite the parties' agreement to substitute the term "weeks" for the term "games" since this would defeat the intent of the parties as indicated by the plain language of the contract.

Class counsel also asserts that this provision is ambiguous and that any interpretation should avoid arbitrary or discriminatory results. The court cannot conclude that the provision here is ambiguous. *See Van Wagner Advertising Corp. v. S & M Enter.*, 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756, 758–59 (1986) (determination of contractual ambiguity is question of law within court's sound discretion). Considered in the context of the CBA as a whole, and based upon the previous discussion, the court does not believe that reasonable minds could differ as to what this provision means. *See id.* Article XVIII § 1(a) clearly and unambiguously specifies "six or more regular season games," not "weeks" or "payments."

Moreover, contrary to class counsel's assertions, the court is not convinced that affirming the special master's interpretation of this provision leads to an arbitrary or discriminatory result. The distinction between games and weeks was drawn by the parties in the CBA, not by the special master or this court. The requirement that a player be on full pay status for six or more regular season games is no more arbitrary or discriminatory than any other

---

4. NFLPA counsel specifically points to a provision in the NFL Constitution and By–Laws that explains what it means to be on "full pay status" for a team. Under that provision, every player under contract to a club must be paid full game salary unless released by the club by a certain day and time prior to the

game. According to class counsel, this demonstrates an instance where the parties have agreed to treat a "week" as a "game" and supports a "conclusion that the parties did not intend to use the phrase 'full pay status for six or more regular season games' to exclude bye weeks." (*See* NFLPA Mem. at 9.)

bright line rule, such as the agreement to require full pay status for six as opposed to five or seven games. The fact that players may be required to perform other services or receive an allotment of compensation during bye weeks does not suggest anything arbitrary or irrational, but instead reflects one of the many compromises reached by the parties during the course of negotiations. *See White*, 972 F.Supp. at 1239 (explaining that the CBA is a "carefully crafted document that contains numerous compromises, trade offs and intricate rules").

Class counsel also stresses that the court must reach a fair and reasonable result in interpreting this provision that is consistent with the purposes sought to be attained by the parties. *See Smith v. Brown & Jones*, 167 Misc.2d 12, 633 N.Y.S.2d 436, 442 (Sup.Ct.N.Y.1995).[5] The language of the CBA demonstratively reflects that when the parties intend to refer to "weeks," as opposed to "games," they do so clearly and unequivocally. *See, e.g.*, Art XLVIII, § 2(b)(i)(a) (obligating NFL clubs to match certain savings plan contributions made by players "who earn (i) a Credited Season by and through the sixth week of the regular season..."); CBA Art. XVI § 4 (defining rights and obligations that

change on the "Tuesday following the tenth week of the regular season.").[6] Similarly, when the parties intend a "bye week" to count as a "game," it is explicitly and clearly stated in the language of the CBA. *See, e.g.*, CBA Art. XXXIV § 4(b) (specifically providing that for purposes of determining eligibility for practice squads "a bye week counts as a game provided the player is not terminated until after the regular season or post-season weekend in question.").

The court thus believes that its interpretation of Article XVIII § 1(a), i.e., construing the definition of an Accrued Season to count only games actually played by a team that is paying a player and not bye weeks in which other NFL teams are playing games, reflects a fair and reasonable interpretation of the CBA since it is consistent with other provisions in the CBA and is in conformance with the purposes of the parties as reflected in the record. *See 3Com Corp. v. Banco de Brasil, S.A.*, 2 F.Supp.2d 452, 457 (S.D.N.Y.1998)(where a contract is silent on the point directly in controversy, the court must give the contract in dispute a fair and reasonable interpretation consistent with its purposes). Had the parties intended the word

---

**5.** To this end, class counsel asserts that there are other provisions in the CBA that do not base a player's qualifications for free agency upon whether a player actually participates in a game played by the club. For example, class counsel cites to players on the Injured Reserve List and the Reserve PUP List as reflecting circumstances where the CBA allows a player to receive credit towards an Accrued Season without requiring a player to actually participate in a game. While it is true that an injured player is credited with a game even though he neither practices nor plays, and in rare cases injured players from different teams can be treated differently if a bye week does not count toward an Accrued Season, the court agrees with the special master's determination that no injured player would be worse off than any of the non-

injured players on his team. Moreover, the fact that a case could possibly arise in which injured players from different teams would face different calculations cannot be considered to reflect an absurd or discriminatory result nor alone provide the basis for an interpretation that would affect all teams and players. Clearly, any such inconsistencies are simply the by-product of the special regulations designed to aid injured players.

**6.** *See also* CBA Art. XIX § 1(b) (signing period for Unrestricted Free Agents); CBA Art. § XIX § 2(i) (signing period for Restricted Free Agents); CBA Art. XX § 16 (signing period for Transition Players); and CBA Art. XX § 17 (signing period for Franchise Players).

"games" to simply means "weeks," they would have explicitly provided, as they did elsewhere, that a bye week counts as a game. *See, e.g.,* CBA Art. XXXIV § 4(b).[7]

The court therefore concludes that under settled principles of contract interpretation, the term, "weeks," cannot be substituted for the term "games." This court has applied this principle of contract interpretation since the beginning of the CBA. *See White v. NFL,* No. 4–92–906, at 7 (D.Minn. March 8, 1994)(Special Master Feerick) (Tab A)("when the parties to the Settlement Agreement in the CBA intended to limit a club's right to withdraw a contract provision that restricts a player's negotiating stance with respect to other clubs, they so state it"). As this court noted in the *Grabach–Hobart* proceeding:

> By employing different language in different sections of the SSA, it is clear that the parties recognized and understood the difference between "sole control" and "likely to be earned". Had the parties intended "likely to be earned" to be the test for the portion of signing bonuses over voidable contract years, they could have so agreed.

*See White v. NFL,* 972 F.Supp. 1230, 1239 (D.Minn.1997).

Thus, this court will not read into the CBA under the guise of contract construction a condition that the parties did not insert or intend to add.

Therefore, after a *de novo* review, the court affirms Special Master Friedenthal's conclusion that the intent of the parties is reflected in the unambiguous language providing that "a player shall receive one Accrued Season for each season during which he was on ... full pay status for a total of six or more regular season games." CBA Art. XVIII § 1(a). And under this provision, a player cannot count toward an Accrued Season a game played by other NFL teams during a week in which the team that pays him has a bye. Since Kyle Richardson was on full pay status for only five regular season games during the 1997 season, he cannot receive credit for an Accrued Season for that season.

Accordingly, **IT IS HEREBY ORDERED** that the objections of class counsel are overruled and the decision of the special master is affirmed.

---

7. Contrary to class counsel's assertions and on the same basis, the court also fails to find that its interpretation leads to an absurd result.