Reggie WHITE, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty–Niners, Ltd.; The Seattle Seahawks, Inc.; Tampa Bay Area NFL Football Club, Inc.; and Pro–Football, Inc., Defendants.

Civ.No. 4–92–906.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 28, 1995.

Edward M. Glennon, Lindquist & Vennum, Minneapolis, Minnesota, and James W. Quinn, Jeffrey L. Kessler, and David G. Feher, Weil, Gotshal & Manges, New York City for plaintiffs.

Daniel J. Connolly, Faegre & Benson, Minneapolis, Minnesota, and Gregg H. Levy, Covington & Burling, Washington, D.C., and Frank Rothman, Shepard Goldfein, Skadden,

Arps, Slate, Meagher & Flom, New York City, for defendants.

DOTY, District Judge.

This matter is before the court on the appeal from the Opinion and Decision ("Opinion") of the Special Master dated May 22, 1995. Based upon a review of the file, record and proceedings herein, and for the reasons stated below, the court affirms the decision of the Special Master.

## BACKGROUND

On May 10, 1995, Class Counsel and the National Football League Players' Association ("NFLPA") commenced an expedited proceeding before the Special Master appointed in this matter, Dean John D. Feerick. Class Counsel and the NFLPA brought the matter before Special Master Feerick because the National Football League Management Committee ("NFLMC") had informed the Clubs that the 30% Down Rule in the Stipulation and Settlement Agreement ("SSA") and the NFL Collective Bargaining Agreement ("CBA") continued to apply to contract renegotiations or extensions reached during the Capped 1995 League Year for player contracts originally executed during the Uncapped 1993 League Year. Class Counsel and NFLPA sought a ruling by the Special Master that renegotiated or extended contracts constituted new contracts under the SSA and CBA for the purposes of applying the 30% Rules. The NFLMC filed an opposing brief, and a hearing was held before Special Master Feerick on May 16, 1995. On May 22, 1995, Special Master Feerick issued his decision denying the relief requested by Class Counsel and the NFLPA. He concluded that a 1995 modification or extension of a 1993 Player Contract remains subject to the 30% Down Rule. This appeal followed.

## DISCUSSION

The issue before the court is whether the parties intended that a NFL Player Contract entered into during an Uncapped League Year and then later renegotiated or extended during a Capped League Year constitutes only a modification of the original NFL Player Contract or a new and distinct NFL Player Contract for the purposes of applying the 30% Rules under the SSA.[1] The 30% Rules state:

1. No NFL Player Contract entered into in an Uncapped Year prior to the 1999 League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Paragraph G.2(d) above, of more than 30% of the Salary of the first League Year of the Contract per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the Contract.

2. No NFL Player Contract entered into in a Capped Year and extending into the 1999 League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Paragraph G.2(d) above, of more than 30% of the Salary provided for in the 1998 League Year, per year, either in the 1999 League Year or in any subsequent League year covered by the Player Contract. For example, a four-year Player Contract signed in the 1998 League Year (assuming it is a Capped Year) may not provide for an annual increase of more than 30% of the 1998 League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.

SSA, Art. X, ¶ H; *see* CBA, Art. XXIV, § 8.[2]

Class Counsel and the NFLPA contend that a renegotiated or extended NFL Player

---

1. The issue as defined by Special Master Feerick was whether "a 1995, or subsequent Capped Year, modification and/or extension of a Player Contract entered into in 1993, an Uncapped year, is subject to the 30% Down Rule." Opinion, 412.

2. In his decision, Special Master Feerick only cited to the applicable sections of the CBA. For purposes of this appeal, however, the court relies upon the application provisions of the SSA. Citations to the corresponding sections of the CBA are included. This was done to reflect the man-

Contract constitutes a new and distinct contract and thus, if "entered into" during a capped year, such a contract is subject to the corresponding 30% Up Rule. The NFLMC argues that a renegotiated or extended NFL Player Contract simply modifies the original contract, and the 30% Down Rule continues to apply. Both parties rely upon the language of the SSA and New York case law.

### 1. Standard of Review

■ As a preliminary matter, the court must decide what standard of review should be applied to the Special Master's decision. Class Counsel and the NFLPA urge the court to conduct a de novo review of his decision while the NFLMC argue that unless the court concludes that the agreement is unambiguous, the proper standard of review is the clearly erroneous standard. The SSA provides:

> 2. The powers of the Court and the Special Master and the rights of the parties in any enforcement proceedings shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:
>
> · · · · ·
>
> (b) The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVII (Anti–Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;
>
> (c) Subject to subsections (a) and (b) above, the Court shall determine all points

ner in which parties' memoranda were submitted. The court notes that in cases of conflict between the SSA and CBA, the *White* settlement agreement prevails. CBA, Art. II, § 1. None of the parties have argued that such a conflict exists as to the issue before the court.

3. If the meaning of a contract is ambiguous then parol or extrinsic evidence may be considered in order to ascertain the intent of the parties. *See*

of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

SSA, Art. XXII, ¶ 2(b) & (c); *see* CBA, Art. XXVI, § 2(b) & 2(c). It is clear that the Special Master's factual findings are reviewed under the clearly erroneous standard subject to certain exceptions not relevant to this appeal. Conclusions of law are reviewed de novo.

■ When a contract is construed according to its terms and without reliance on extrinsic evidence, its interpretation is a question of law which is subject to plenary review. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1023 (8th Cir.1992); *Towers Hotel Corp. v. Rimmel*, 871 F.2d 766, 770 (8th Cir.1989). Under New York law, which governs the SSA and CBA's construction and interpretation, determining whether a contract is ambiguous and interpreting an unambiguous contract are also questions of law. *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990); *Van Wagner Advertising Corp. v. S & M Enters*, 67 N.Y.2d 186, 191, 492 N.E.2d 756, 501 N.Y.S.2d 628 (1986).[3]

Reviewing the Special Master's decision, there is no indication that he relied upon parole or extrinsic evidence in interpreting the CBA and concluding that a renegotiation only modifies a Player Contract. Rather, the Special Master's decision is based upon the language of the CBA and New York case law. Accordingly, the court reviews the Special Master's decision de novo.

### 2. Contract Renegotiations and the 30% Down Rule

■ As stated above, both the SSA and CBA are governed by New York law. Under

*Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2nd Cir.1992). Under such circumstances, the meaning of a contract generally becomes a factual determination. *See Amusement Business Underwriters v. American Int'l Group*, 66 N.Y.2d 878, 880, 489 N.E.2d 729, 498 N.Y.S.2d 760, (1985); *Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 170, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973). In his decision, the Special Master did not state whether he considered the CBA ambiguous or not.

New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (1985). "The objective in any question of the interpretation of a written contract, of course, is to determine 'what is the intention of the parties as derived from the language employed.'" *Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 171–72, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973) (quoting 4 S. Williston, *A Treatise on the Law of Contracts* § 600, at 280 (3d ed. 1961)). The court should also give the words in a contract their plain and ordinary meaning unless context mandates a different interpretation. *See Laba v. Carey,* 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641, *mot. for rearg. den.* 30 N.Y.2d 694, 332 N.Y.S.2d 1025, 283 N.E.2d 432 (1971).

■ The plain language of the 30% Rule unambiguously applies to all NFL Player Contracts entered into during an uncapped year. The language does not provide for any exceptions. However, Class Counsel and the NFLPA note that included in the definition of "NFL Player Contract" is the term "Player Contract" which is defined under the SSA as a "written agreement or series of such agreements executed at or about the same time between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player." SSA, Art. I, ¶ (ai); *see* CBA, Art. I, § 2(y).[4] Class Counsel and the NFLPA contend that since it is the common practice for a player and Club to sign a new agreement after completing a renegotiation, and the signing does not occur "at or about the same time" as the original Player Contract, a later renegotiation of a Player Contract cannot constitute part of the original Player Contract. Thus, Class Counsel and the NFLPA assert that a renegotiation is a new and distinct Player Contract for purposes of the 30% Down Rule.

Class Counsel and the NFLPA also argue that the SSA expressly recognizes that a renegotiated Player Contract is "entered into" separately from the underlying Player Contract being renegotiated. Class Counsel and the NFLPA cite to the SSA's certification provision, which states that "[e]very Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement" contain certifications by the player, his agent and the Club that no undisclosed agreements concerning a player's salary exist. SSA, Art. XVI, ¶ 1; *see* CBA, Art. XXIX, § 1. Thus, Class Counsel and the NFLPA argue that the SSA recognizes that contract negotiations separated in time cannot be lumped together.

Under the SSA, the term "renegotiate" is defined as "any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract." SSA, Art. I, ¶ (al); *see* CBA, Art. I, § 2(ab). Because renegotiate refers to salary changes "during the term of a Player Contract," the NFLMC contends that the definition of "renegotiate" indicates that a renegotiation simply modifies a Player Contract and does not create a new and distinct contract.

The NFLMC argues that the intent to treat a renegotiation as only a modification of a Player Contract finds further support in the part of the SSA which specifically addresses the scope of contract renegotiations and extensions. The provision discussing contract renegotiations states in part:

Provided that all salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

1. The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original term of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

I, ¶ (o); CBA, Art. I, ¶ (h).

---

4. NFL Player Contract is defined as "the form of Player Contract utilized in the NFL." SSA, Art.

SSA, Art X, ¶ I(1); *see* CBA, Art. XXIV, § 9(a).[5]

The NFLMC argues that the use of the phrase "first renegotiation of a Veteran Player Contract" demonstrates that the parties anticipated multiple renegotiations of the same contract. According to the NFLMC, the phrase "during the original term of the contract" also indicates that a Player Contract continues as modified "after the player's most recent contract renegotiation." The court agrees and finds that the provision demonstrates that a renegotiated contract does not replace the original Player Contract.

The court also finds that requiring "any renegotiation, extension or amendment of a Player Contract" to contain certifications from the parties does not necessarily support Class Counsel and the NFLPA's position. The certification provision also states "that the Player Contract, renegotiation, extension or amendment sets forth all components of a player's remuneration...." SSA, Art. XVI, ¶ 1; *see* CBA, Art. XXIX, § 1. A similar provision is also found in paragraph 24 of the form NFL Player Contract. This provision states that "[e]ach of the undersigned hereby confirms that (i) this contract, renegotiation, extension, or amendment sets forth all components of the player's remuneration for playing professional football". CBA, App. C, ¶ 24. The certification provision differentiates between a Player Contract, a renegotiation, extension or amendment and treats them separately. Accordingly, the court concludes that a renegotiated or extended contract is distinct from a Player Contract under the terms of the SSA.

▮ Reviewing the SSA, the court finds that Class Counsel and the NFLPA's interpretation of the SSA is unreasonable in light of the language concerning renegotiations. Under New York law, an interpretation that "gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985) (citations omitted). Moreover, a court may not rewrite into a contract conditions the parties did not insert or, under the guise of construction, add or excise terms. *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (1985). Adhering to these principles, the court holds that under the SSA, a renegotiated contract does not create a new and distinct Player Contract but only modifies a Player Contract.

In Special Master Feerick's decision, he stated that one of the purposes of the 30% Down Rule was to prevent front-loading.[6] He also stated that another purpose was the rule's relationship to the whole scheme covering a Guaranteed League–Wide Salary, Salary Cap and Minimum Team Salary. Opinion, p. 7. Class Counsel and NFLPA argue that the only purpose of the 30% Down Rule was to prevent a Club and player from front-loading a player's salary in an Uncapped Year. Because the SSA prohibits the renegotiation of terms for a prior League Year, Class Counsel and the NFLPA argue that it is not possible to front-load after the first year of a Player Contract. However, as noted by the Special Master, if a renegotiated Player Contract were considered a new Player Contract, then front-loading or back-loading would be both possible and, as argued by Class Counsel and the NFLPA, permitted. Class Counsel and the NFLPA also contend that a player and club could renegotiate a Player Contract to extend into the Uncapped 1999 League Year and back-load a player's salary without the 30% Up Rule prohibiting such action. However, given the plain language regarding renegotiations, the court fails to find the arguments of

---

**5.** The remaining provisions of Article X ¶ I state:

　2. No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

　3. No contract renegotiations may be done for a current season after the last regular season game of that season.

　4. A player contract signed by a Rookie may not be renegotiated except as provided in Article V (Entering Player Pool), paragraph 4(f).

　5. As provided in Article IX (Final Eight Plan), paragraphs 3 and ·4.

**6.** Front-loading occurs when the bulk of the salary in a Player Contract that is entered into during an Uncapped Year and extends into a Capped Year is paid in the Uncapped Year.

Class Counsel and the NFLPA concerning the purposes of the 30% Rules persuasive.

Special Master Feerick also based his decision on New York contract law, citing *Schwartzreich v. Bauman–Basch, Inc.*, 231 N.Y. 196, 131 N.E. 887 (1921), *rearg. denied* 231 N.Y. 602, 132 N.E. 905 (1921). In *Schwartzreich*, the New York Court of Appeals stated:

> Where, however, an existing contract is terminated by consent of both parties and a new one executed in its place and stead, we have a different situation and the mutual promises are again a consideration. . . .

> All concede that an agreement may be rescinded by mutual consent and a new agreement made thereafter on any terms to which the parties may assent. . . .

> .    .    .    .    .    .

> The same effect follows in our judgment from a new contract entered into at the same time the old one is destroyed and rescinded by mutual consent. The determining factor is the rescission by consent. Provided this is the expressed and acted upon intention. . . .

*Id.*, 231 N.Y. at 203–05, 131 N.E. 887. Under New York law, parties may also modify an existing contract by simply executing a new written agreement. *See* N.Y.Gen. Oblig.Law § 5–1103 (McKinney 1994). Thus, the issue of whether the parties modified a contract, adding new terms, or rescinded a contract turns on the intent of the parties. The issue presently before the court is whether the intent of the parties as evinced by the SSA indicates that the 30% Rule would continue to apply to renegotiated or extended Player Contracts. Based upon the language of the SSA, the court concludes that the rule continues to apply.

### CONCLUSION

Based upon the foregoing, the court concludes that under the SSA and CBA a renegotiated or extended contract only modifies a Player Contract. Accordingly, the court af-

firms Special Master Feerick's decision dated May 22, 1995.