Reggie WHITE, et al., Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE, et al., Defendants.

No. 4–92–906 (DSD).

United States District Court, D. Minnesota.

March 30, 2000.

---

James W. Quinn, Jeffrey L. Kessler, Bruce S. Meyer, David G. Feher, Weil, Gotshal & Manges, New York City, Edward M. Glennon, Lindquist & Vennum, Minneapolis, MN, counsel for NFLPA.

Gregg H. Levy, Neil K. Roman, Michael X. Imbroscio, Covington & Burling, Washington, DC, Daniel J. Connolly, Faegre & Benson, Minneapolis, MN, Dennis Curran, General Counsel, National Football League, New York City, counsel for NFLMC.

Thomas D. Yannucci, Steven G. Bradbury, Theodore W. Ullyot, Kirkland & Ellis, Washington, DC, Robert P. Thavis, Steven P. Zabel, Leonard Street & Deinard, Minneapolis, MN, counsel for Steinberg & Moorad.

Denis P. O'Leary, Neufeld & O'Leary, New York City, Scott A. Benson, Briol & Associates, Minneapolis, MN, counsel for Gary Wichard.

## ORDER

DOTY, District Judge.

This matter is before the court on the cross-objections of the parties to the decision of the special master dated February 18, 2000. Based on a review of the file, record, and proceedings herein, the court reverses in part and affirms in part the decision of the special master.

## BACKGROUND

This appeal arises out of a special master proceeding commenced by the National Football League Management Council ("NFLMC") in June 1999. The NFLMC alleges that the San Francisco 49ers and certain player agents entered into undisclosed agreements concerning player compensation, in violation of the NFL Collective Bargaining Agreement ("CBA") and the stipulation and settlement agreement in this case ("SSA"). In the underlying proceeding, the NFLMC has pursued discovery against player agents Leigh Steinberg, Jeffrey Moorad, and Gary Wichard. These agents have opposed discovery on the ground that they were not signatories to the CBA and SSA and are not subject to any penalty scheme provided in those agreements. Because of this dispute, discovery of player agents has been stayed since January 3, 2000.

On February 18, 2000, after extensive briefing and oral argument on the status of player agents under the CBA and SSA, the special master issued a decision dismissing the player agents from the underlying proceeding. *See* Special Master's Decision as to the Status, Rights and Obligations of Players Agents Under the NFL Collective Bargaining Agreement at 12 (Feb. 18, 2000) ("Decision"). However, the special master also conditionally ruled that, if this court were to find that player agents were bound by the CBA and SSA, then player agents could be subject to penalties under Article XXIX, Section 3 of the CBA and Section XVI, Paragraph 3 of the SSA. *Id.*

The NFLMC and the National Football League Players Association ("NFLPA") have filed objections to that portion of the special master's decision dismissing the player agents from the underlying proceeding. Steinberg, Moorad, and Wichard have filed objections to the special master's conditional ruling that player agents are subject to the penalty provision contained in Article XXIX, Section 3 of the CBA and Section XVI, Paragraph 3 of the SSA.

## DISCUSSION

### A. Standard of Review

In reviewing the special master's decision, the court must separately address the two fundamental issues raised by this dispute: (1) whether the contracting parties intended to bind player agents to the CBA and SSA and (2) whether, under the applicable legal rules, player agents have in fact been bound. The first issue involves a purely legal question of contractual interpretation. *See White v. NFL,* 899 F.Supp. 410, 413 (D.Minn.1995) (interpreting the unambiguous terms of a contract is a question of law).[1] The second issue involves a primarily factual question of consent. Thus, the court's review of the special master's rulings on the first issue will be de novo, while its review of the special master's ruling on the second issue will be conducted under the clearly erroneous standard. *See id.* (under the CBA and SSA, the special master's conclusions of law are reviewed de novo and his factual findings are reviewed for clear error).

### B. Did the Parties Intend to Bind Player Agents to the CBA and SSA?

The court will first address whether the CBA and SSA purport to bind player agents to their terms. The interpretation of the CBA and SSA is governed by New York law. *See White v. NFL,* 899 F.Supp. at 413. As this court has previously stated:

Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from

---

1. As will become clear, the court finds no ambiguity in the contractual language at dispute in this case. *See White v. NFL,* 899

F.Supp. at 413 (determining whether a contract is ambiguous is a question of law).

the language employed. The court should also give the words in a contract their plain and ordinary meaning unless the context mandates a different interpretation.

*Id.* at 414 (citing New York law). Further, the court must give effect and meaning to every term of the contract, making every reasonable effort to harmonize all of its terms. *See Reda v. Eastman Kodak Co.,* 233 A.D.2d 914, 915, 649 N.Y.S.2d 555 (1996). The contract must also be interpreted so as to effectuate, not nullify, its primary purpose. *See id.*

The CBA and SSA contain a pair of provisions that, on their face, would appear to manifest the contracting parties' intent to bind player agents to the agreements. The first provision states:

> Binding Effect. This agreement *shall be binding upon* and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, *representatives, agents,* successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

CBA Art. LV, § 14; SSA § XXX, ¶ 2 (emphasis added). Notwithstanding the clarity of this provision, the special master concluded that it should be discounted on the ground that it is "mere boilerplate." Decision at 8. However, while it is true that language of this kind commonly appears in contractual agreements, this fact alone does not render the provision inoperative. As the special master himself recognized, this provision is "utilized throughout the law to ensure continuity of obligation against those who stand in the shoes of a party." *Id.* Further, "a court may not rewrite into a contract conditions the parties did not insert or, under the guise of construction, add or excise terms." *White v. NFL,* 899 F.Supp. at 415 (citation omitted). Boilerplate or not, then, the court must take seriously the parties' broad declaration of "binding effect" in evaluating whether they intended to subject player agents to the CBA and SSA.[2]

Moreover, a second provision, addressing contract "certifications," makes it abundantly clear that the parties intended to bind player agents to the agreements. *See* CBA Art. XXIX; SSA § XVI. This provision sets forth the procedure by which the persons negotiating a player contract must certify the integrity of the contract under the CBA and SSA, and specifically instructs that "any player representative who negotiated the contract on behalf of the player" must execute the certification. CBA Art. XXIX, § 1(a); SSA § XVI, ¶ 1. It then provides:

> Any person who knowingly files a false certification required [above] shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master. The amount of such fine as to a Club or non-player Club employee shall be determined by the Commissioner.

CBA Art XXIX, § 3; SSA § XVI, ¶ 1. As the special master stated, "the only sensible interpretation of [the penalty provision] is that it was intended to apply to any person who executes such a false certification with the intent the Player Contract involved will become effective." Decision at 10.[3] The special master thus

---

**2.** While the special master did not address the issue, it is clear that player agents are among the "agents" and "representatives" contemplated in this provision. The CBA itself, and the standard NFL player contract, employ the term "agent" and "representative" to refer to player agents. Art VI, § 1; Art. XXIV, § 1; App. C, at ¶ 25. In addition, as the standard player contract makes explicit, the player agent acts as the "agent" of the individual member of the *White* class whom he represents. *See* CBA App. C, at ¶ 23 (referencing player's "rights as a member of the White class"); ¶ 25 (designating player agent as

"player's certified agent"). Finally, when player agents apply for certification to the NFLPA, they are expressly notified that they will be considered "[p]ersons serving ... as the NFLPA's 'agent' pursuant to [the agent certification provision of] the CBA." NFLPA Regs. at 2.

**3.** The special master also properly construed the language in CBA Article XXVI, Section 7 to "merely distinguish[ ] between the ability of the Special Master to impose fines against a Club and the League and his inability to do so

found, and the court agrees, that the false certification provision empowers him to impose a fine on a player agent who executes a false certification. *Id.*

Notwithstanding this finding, however, the special master concluded that his power to penalize player agents is negated by a separate provision in the CBA addressing the regulation of player agents:

> The NFLMC and the Clubs recognize that the NFLPA regulates the conduct of agents who represent players in individual contract negotiations with Clubs. The NFLMC and the Clubs agree that the Clubs are prohibited from engaging in the individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players..... The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent....

CBA Art. VI, § 1. The special master concluded that this provision vests in the NFLPA exclusive regulatory authority over player agents, thereby depriving him of jurisdiction to fine a player agent for submitting a false certification.

In reaching this conclusion, however, the special master made several interpretive errors. First, he read the word "exclusively" into the first sentence of this provision, thereby disregarding the principle that a court shall neither add nor remove terms in the service of construction. *See White v. NFL*, 899 F.Supp. at 415. Second, he interpreted the agent regulation provision so as to create a direct conflict with the false certification provision, thereby disregarding the principle that a court shall make every reasonable effort to harmonize the terms of a contract. *See Reda*, 233 A.D.2d at 915, 649 N.Y.S.2d 555. Third, he improperly downplayed the fact that, in a sentence appearing toward the end of the provision, the parties clearly demonstrate that they know how to assign

"exclusive" authority to the NFLPA when they want to: "The NFLPA shall have *sole and exclusive* authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent." CBA Art. VI, § 1 (emphasis added).

The special master justified this departure from the plain language of the text on the ground that he was correcting an obvious instance of "imprecise drafting." Decision at 9. In fact, however, this provision appears to offer an example of very careful drafting, whereby the contracting parties achieve three important results: (1) they explicitly "recognize" that the NFLPA has direct regulatory authority over player agents; (2) they implicitly "recognize" that the NFLMC and the Clubs do not have direct regulatory authority over player agents; and (3) they leave open the possibility of some other regulatory arrangement by separate agreement of the parties, so long as the subject matter of that special arrangement does not involve determining "the number of agents to be certified, and the grounds for withdrawing or denying certification." In other words, this provision fully anticipates, and is wholly consistent with, the parties' decision in Article XXIX of the CBA to vest the special master with regulatory authority over player agents with respect to the issue of false certification.

In sum, after conducting a de novo interpretation of the relevant contractual provisions, the court concludes that the parties to the CBA and SSA clearly intended to bind player agents to those agreements.

## C. Have the Player Agents Consented to Be Bound by the CBA and SSA?

This conclusion, however, does not end the court's analysis. As the special master aptly observed, "under basic common law contract doctrine, borne by simple justice, a [third party] cannot be bound to a contract without his or her consent in some form." Decision at 2. The Supreme Court

---

against a non-playing employee or officer or owner of a Club." Decision at 10.

has directly addressed the issue of third-party consent in two cases relevant to the present dispute. In *Local No. 93, International Association of Firefighters, AFL–CIO v. City of Cleveland,* the Supreme Court addressed the extent to which a court-approved settlement between two parties may bind a third party:

> Of course, parties who choose to resolve litigation may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement.... And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree.

478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). And in *NLRB v. Burns International Security Services, Inc.,* the Court applied the "normal contract principle [that] a party [cannot] be bound to a contract in the absence of consent" to a case arising under federal labor law, holding that a successor corporation could not automatically be bound to the terms of the collective bargaining agreement entered into by its predecessor. 406 U.S. 272, 285–86, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

■ Under common law contract doctrine, a third party may consent to the terms of a contract expressly through words or tacitly by conduct. *See* Restatement (Second) of Contracts § 19; ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or failure to act."); *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776–77 (2d Cir.1995) (stating that "under ordinary principles of contract," "a [non-signatory] may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate"); *D'Angelo v. Bob Hastings Oldsmobile, Inc.,* 89 A.D.2d 785, 786, 453 N.Y.S.2d 503 (N.Y.App.Div.1982) (a contract may be implied in fact where "the person to be charged 'has conducted himself in such a manner that his assent may fairly be inferred' " (citation omitted)). Although silence does not ordinarily manifest assent, where the relationship between the parties is such that even a non-signatory would be expected to reply, silence can create a binding contract. *See* Restatement § 69 (silence will operate as acceptance: (1) "[w]here an offeree takes the benefit of offered services with the reasonable opportunity to reject them and reason to know that they were offered with expectation of compensation" and (2) "[w]here because of previous dealings ..., it is reasonable that the offeree should notify the offeror if he does not intend to accept"). *See also Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 608 A.2d 280, 284–85 (1992); *Holt v. Swenson,* 252 Minn. 510, 90 N.W.2d 724, 728–29 (1958); *Albrecht Chemical Co. v. Anderson Trading Corp.,* 298 N.Y. 437, 84 N.E.2d 625, 626 (1949). In *Burns,* for example, the Supreme Court found that a third-party successor corporation was not bound to the collective bargaining agreement of its predecessor, but only after concluding that "nothing in [the successor's] actions ... indicated that [it] was assuming the obligations of the contract." 406 U.S. at 287, 92 S.Ct. 1571. *See also Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Restaurant Employees & Bartenders Int'l Union, AFL–CIO,* 417 U.S. 249, 258, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) (refusing to compel successor corporation to arbitrate pursuant to collective bargaining agreement in the absence of an "express or implied assumption of the agreement to arbitrate"). And in *Lee v. Chica,* 983 F.2d 883 (8th Cir.1993), the Eighth Circuit held that a stockbroker could be compelled to arbitrate claims brought against him, even though the broker did not sign the underlying customer agreement. The Eighth Circuit found assent under the following circumstances: (1) a clear statement in the arbitration clause of the agreement providing that "any controversy aris[ing] out of the customer agreement" would be settled by arbitration; (2) the broker's knowledge of the agreement; and (3) the broker's continued management of the customer's account in the face of the agreement. *Id.*

at 887. *See also Distillery, Wine & Allied Workers Int'l Union v. National Distillers & Chemical Corp.*, 894 F.2d 850, 851 (6th Cir.1990) ("While only parties to collective bargaining agreements are bound generally, in some instances a non-signatory to the agreement may be so closely related to a signatory that both are bound."); *Perfect Fit Prods. Mfg. Co. v. Pantasote Co.*, 5 Misc.2d 348, 161 N.Y.S.2d 376, 378 (N.Y. Tr. Term 1957) (finding assent where "[e]xperienced, competent business men had staked out the ground in which they were carrying out their dealings and their conduct within that area can be resorted to indicate agreement").

■ In light of this precedent, the court concludes that the player agents have consented to be bound by the terms of the CBA and SSA. Several factors dictate this conclusion. First, player agents and the NFLPA are engaged in precisely the kind of special relationship that gives rise to principles of implied consent. Under federal labor law, the NFLPA has exclusive authority to negotiate with NFL clubs on behalf of NFL players. *See* National Labor Relations Act § 9(a) (codified at 29 U.S.C. § 159(a)). Player agents are permitted to negotiate player contracts in the NFL only because the NFLPA has delegated a portion of its exclusive representational authority to them. *See Collins v. NBA*, 850 F.Supp. 1468, 1475 (D.Colo. 1991) ("A union may delegate some of its exclusive representational authority on terms that serve union purposes, as the NBPA has done here. The decision whether, to what extent and to whom to delegate that authority lies solely with the union."). In *H.A. Artists & Associates v. Actors' Equity Association*, the Supreme Court concluded that a closely analogous representational scheme—one involving theatrical agents who individually negotiated contracts for the members of an actors' union—demonstrated an "economic interrelationship" such that the agents must be defined as a "labor group" under federal labor law. 451 U.S. 704, 721–22, 101 S.Ct. 2102, 68 L.Ed.2d 558. *See also id.* at 721, 101 S.Ct. 2102 ("Agents perform a function—the representation of union members in the sale of their labor—that in most nonentertainment industries is performed exclusively by unions."); *Collins*, 850 F.Supp. at 1477–78 (analogizing agents for professional basketball players to the theatrical agents in *H.A. Artists*). Because an almost identical "interrelationship" exists here, it is not legally tenable for player agents to claim that they are strangers to the core legal agreements entered into by the NFLPA and the players.

Second, player agents enjoy significant and ongoing economic benefits because of their relationship with the NFLPA and the players, benefits that flow directly from the CBA and SSA. For example, Article VI of the CBA specifically bars NFL clubs from negotiating with anyone other than an agent certified by the NFLPA, thereby granting certified agents a powerful competitive advantage in the market for player-clients. And because player agents are compensated under percentage-fee arrangements, the CBA and SSA directly benefit them by mandating guaranteed league-wide salaries and minimum club salaries. *See* CBA Art. XXIV; SSA § X. The legal consequence of this arrangement is clear: When third parties like the player agents silently reap the benefits of contractual agreements like the CBA and SSA, they cannot later disclaim the obligations these agreements impose on them. *See, e.g.,* Restatement § 69(1)(a); *Weichert,* 608 A.2d at 285 ("[W]here an offeree gives no indication that he or she objects to any of the offer's essential terms, and passively accepts the benefits of an offeror's performance, the offeree has impliedly manifested his or her unconditional assent to the terms of the offer.").

Third, apart from manifesting consent through their conduct, certified player agents have expressly agreed to be bound by NFLPA agent regulations, which include specific provisions (1) requiring each certified player agent to become familiar with "applicable Collective Bargaining

Agreements and other governing documents" and (2) prohibiting certified agents from "negotiating and/or agreeing to any provision in any agreement involving a player which directly or indirectly violates any stated policies or rules established by the NFLPA." NFLPA Regs. §§ 3.A(15); 3.B(10). There is no question that the CBA and SSA are among the "Collective Bargaining Agreements and other governing documents" and "policies or rules" referenced in these regulations. Thus, by expressly agreeing to represent players under these provisions of the NFLPA regulations, player agents have necessarily agreed to comply with the relevant terms of the CBA and SSA.

■ Despite the fact that they would appear to support a finding of consent, the NFLPA regulations played a central role in the special master's decision to dismiss the player agents from the underlying proceeding. The special master concluded that player agents are not subject to a false certification penalty under the CBA and SSA because the NFLPA did not specifically provide for this penalty in its regulations. *See* Decision at 11. However, this conclusion is based on the faulty premise that the CBA vests exclusive regulatory authority in the NFLPA. As discussed in Part B, the CBA clearly provides for concurrent regulatory jurisdiction, whereby the NFLPA generally regulates agent conduct while the special master specifically regulates agent conduct relating to false certifications. *See* CBA Art. VI, § 1; CBA Art. XXIX, § 3. The NFLPA regulations are entirely consistent with the contractual scheme, focusing on the agents' obligations to the players, not on the agents' specific obligations under the CBA and SSA. *See generally* NFLPA Regs. §§ 3(B)-(C). Nothing in the NFLPA regulations forecloses the possibility that a player agent will be subject to a penalty under the CBA and SSA if he submits a false certification. To the contrary, and as just discussed, the NFLPA regulations specifically direct the player agent to learn about and comply with any

other obligation he might have under the CBA and SSA. *See id.* §§ 3.A(15); 3.B(10).

Finally, even if the NFLPA regulations did not expressly charge player agents with knowledge of the contents of CBA and SSA, no player agent can credibly argue that he is surprised by the penalty for false certification. The CBA and SSA govern the economics of professional football just as surely as the official NFL rulebook governs the game of professional football. To successfully negotiate with NFL clubs, player agents must be intimately familiar with many aspects of the CBA and SSA, including their detailed rules about free agency, franchise player designation, guaranteed minimum salary, and salary cap operation. Further, to execute a valid player contract, agents must carefully follow the contract certification rules set out in Article XXIX of the CBA and Section XVI of the SSA. Indeed, the standard player contract, which must be used in each negotiation, and which the negotiating player agent himself must sign, directly quotes the contract certification provision. *See* CBA App. C ¶ 24. And it is precisely here, in the contract certification provision, that the player agent is warned that "[a]ny person who knowingly files a false certification ... shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master." CBA Art. XXIX, § 3; SSA § XVI, ¶ 3.

The agent's act of player contract certification thus places in bold relief the issue of consent presented by this dispute: It represents both the moment at which the player agent most clearly stands to reap the benefits of the CBA and SSA and the moment at which he is made most acutely aware of his obligations, and his potential liability, under those agreements. When the agent signs his name to the contract certification, fully informed of the rewards and obligations attaching to this act, he has manifested a consent to be bound by the CBA and SSA just as clearly as if he had signed the CBA and SSA themselves.

For all these reasons, the court concludes that the player agents are bound by the terms of the CBA and SSA. The special master's finding to the contrary was clearly erroneous. As a legal matter, the special master incorrectly assumed that the NFLPA has sole regulatory authority over player agents. As a factual matter, the special master failed to consider uncontradicted evidence demonstrating that the player agents have consented to be bound by the CBA and SSA. Accordingly, the court must reverse the special master's decision insofar as it dismisses the player agents from the underlying proceeding.[4]

### D. Applicable Penalty Provisions

■ Steinberg, Moorad, and Wichard have objected to the special master's conditional ruling that he has the power to penalize player agents for false certification. As discussed in Part B above, however, the court wholly concurs with this aspect of the special master's decision. The court also disagrees with any suggestion by the NFLMC that player agents may be subject to penalties under the CBA and SSA other than by Article XXIX, Section 3 of the CBA and Section XVI, Paragraph 3 of the SSA. As the court's analysis in Part B demonstrates, when the contracting parties intended to subject player agents to a penalty, they expressly provided for it. Finally, because the special master has declined to rule on the scope of his civil contempt powers, the court will not address the issue here, except to note its agreement with his observation that, under the clear terms of the CBA and SSA, "those powers are strictly limited." Decision at 11.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. The portion of the special master's decision dismissing player agents from the underlying proceeding is reversed.

2. The portion of the special master's decision finding that player agents are subject to the penalty provision contained in Article XXIX, Section 3 of the CBA and Section XVI, Paragraph 3 of the SSA is affirmed.

---

**4.** As the NFLMC and NFLPA agree, the player agents are subject to the same procedural rights and obligations as any other participant in the underlying proceeding.