**Reggie WHITE, et al., Plaintiffs,**

v.

**NATIONAL FOOTBALL LEAGUE, et al., Defendants.**

No. Civ. 4–92–906(DSD).

United States District Court,
D. Minnesota.

March 31, 2000.

James W. Quinn, Jeffrey L. Kessler, Bruce S. Meyer, David G. Feher, Weil, Gotshal & Manges, New York City, Edward M. Glennon, Lindquist & Vennum, Minneapolis, MN, Richard Berthelsen, National Football League Players Association, Washington, DC, for the NFLPA.

Gregg H. Levy, Neil K. Roman, Michael X. Imbroscio, Covington & Burling, Washington, DC, Daniel J. Connolly, Faegre & Benson, Minneapolis, MN, Dennis Curran, General Counsel, National Football League, New York City, for the NFLMC and the Arizona Cardinals.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff's appeal from the special master's deci-

sion dated February 10, 2000. Based on a review of the file, record, and proceedings herein, the court affirms the special master's decision.

## BACKGROUND

This case arises out of a special master proceeding commenced by Class Counsel and the National Football League Players Association (collectively, "NFLPA") in December 1999. The NFLPA alleges that the Arizona Cardinals entered into an undisclosed arrangement with Gary Wichard, the player agent for the Cardinal's designated franchise player Rob Moore, in an attempt to avoid losing their franchise-player designation for the length of Moore's multiple-year contract. The Cardinals and the National Football League Management Council (collectively, "NFLMC") deny that such an arrangement existed.

The stipulation and settlement agreement ("SSA") and the NFL Collective Bargaining Agreement ("CBA") permit each NFL team to designate as a "franchise player" one player who would otherwise be an unrestricted free agent. *See* SSA Art. VIII, ¶ 1; CBA Art. XX, § 1.[1] These designations must be made between February 1 and February 15 of each year, *id.* ¶ 1, and must be accompanied by a one-year contract offer for the greater of the average of the five largest salaries for players at the relevant position or 120 percent of the player's prior year salary, *id.* ¶ 2. Under the original provisions of the SSA, if a club signs a player to a multiple-year contract while the player is subject to the franchise player designation, the club is deemed to have utilized its designation for the duration of that contract. *Id.* ¶ 9. However, a recent amendment to the SSA modifies the original contractual scheme:

> If a Club and a player agree to extend ... a Player Contract on or after July 15 in the League Year for which the Club designated the player as a Franchise Player, such Club shall not be

deemed to have utilized its Franchise Player designation pursuant to [this Paragraph] for the period of the extension, unless there has been a violation of the provisions of Article XV (Enforcement of the Salary Cap and Entering Player Pool), Paragraphs 1 or 2, with respect to such contract extension.

*Id.* Thus, when a club signs a designated player to a one-year contract and then, on or after July 15 of the designation year, extends that player's contract, the club will presumptively retain its franchise-player designation for the subsequent years of that player's contract. However, if the NFLPA can demonstrate that the contract extension involved some "undisclosed term" or act of "circumvention" prohibited under Paragraphs 1 and 2 of Article XV, then the club will lose its franchise player designation for the entire period of the contract.

On February 11, 1999, the Arizona Cardinals designated Moore as its franchise player. The Cardinals tendered Moore a one-year contract in the amount required under the SSA. By late August, Moore still had not signed the one-year contract. With the regular season fast approaching, Wichard and the Cardinal's chief contract negotiator Rod Graves began negotiating in earnest, making a series of multiple-year offers and counteroffers. On September 9, 1999, Moore met personally with Graves and Cardinals owner William Bidwill, Sr., and his son, team Vice President William Bidwill, Jr., at the Cardinals offices. Wichard participated in the meeting by speaker phone. At the end of that meeting, after receiving certain assurances from Graves and the Bidwills, Moore signed the one-year contract. On September 22, 1999, Moore signed a four-year contract with the Cardinals.

In December 1999, the NFLPA commenced a special master proceeding against the Cardinals. On February 10, 2000, at the request of the parties, the

---

**1.** Although the court will solely refer to the SSA throughout the remainder of this order, each of the relevant provisions have their parallel in the CBA.

special master held an expedited hearing on the matter. Graves testified in person, and Wichard's video deposition was shown. There were no other witnesses. At the close of the hearing, the special master ruled in favor of the Cardinals. A written decision was issued quickly thereafter. *See* Decision Regarding the Ability of the Arizona Cardinals Football Club to Designate a Franchise Player for the 2000 Season (Feb. 10, 2000). Based on the special master's ruling, the Cardinals designated another player, Simeon Rice, as their franchise player for the 2000 league year. The NFLPA now appeals from the special master's ruling.

## DISCUSSION

### A. Standard of Review

When challenged on appeal, the special master's conclusions of law are reviewed de novo and his factual findings are reviewed under the clearly erroneous standard. *See White v. NFL*, 899 F.Supp. 410, 413 (D.Minn.1995). The NFLPA contends that the decision below is subject to de novo review on the ground that the special master incorrectly applied the SSA to the undisputed evidence before him. As discussed below, the court disagrees with this contention. Thus, because this dispute implicates the special master's factual determinations only, the court may reverse the special master only if it concludes that his decision was clearly erroneous. "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Moreover, the special master's credibility assessments are entitled to "great deference." *See United States v. J.H.H.*, 22 F.3d 821, 830 (8th Cir.1994).

### B. Interpretation of Paragraph 1

As a threshold matter, the court must resolve a disagreement between the parties as to the correct interpretation of Article XV, Paragraph 1 of the SSA ("Paragraph 1"), which prohibits the existence of "undisclosed terms" that are related to the execution of a player contract:

At the time a Club and a player enter into any Player Contract ... there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Club involving consideration of any kind....

The NFLPA and the NFLMC agree that a mere assurance of an intent to negotiate in good faith would not violate Paragraph 1. The NFLMC takes this argument one step further, suggesting that undisclosed "assurances of intent" concerning the length of a player's contract are also not prohibited. As the NFLPA points out, however, Paragraph 1 relates to assurances "involving consideration of any kind." And there can be no doubt that the number of years under a contract is form of consideration, especially in the context of the NFL, where multiple-year contracts enable the parties to spread out signing bonuses over the entire term of the contract, thereby minimizing the impact on a team's salary cap. *See* Black's Law Dictionary 277 (5th ed.1979) (defining "consideration" as the "inducement to a contract" and "the cause, motive, price, or impelling influence which induces a contracting party to enter into a contract"). Accordingly, the court concludes that an assurance of intent concerning a multiple-year term is conduct prohibited under Paragraph 1.

### C. Assurances of Intent on September 9, 1999

Based on the foregoing interpretation of Paragraph 1, the NFLPA argues that the special master erred as a matter of law when he failed to rule that the Cardinals violated the SSA by making prohibited assurances of intent to Wichard on September 9, 1999, the day of the meeting between Moore and the Bidwills in the Cardinal's offices. The NFLPA grounds

this assertion on the following testimony of the Cardinal's negotiator Rob Graves:

> NFLPA COUNSEL: Now, you also testified or it is true isn't it, that [on September 9, 1999] *you assured Mr. Wichard of your intent to do a long-term deal, correct?*
>
> GRAVES: *That's correct.*
>
> NFLPA COUNSEL: On September 9, 1999 *you assured Mr. Wichard of your intent to do a long-term deal, correct?*
>
> GRAVES: *My intent to do that, yes.*
>
> NFLPA COUNSEL: And then the contract was signed after the meeting or at the end of the meeting after the conversation about the assurances, Mr. Moore signed a one-year contract, correct?
>
> GRAVES: That's correct.

Hearing Tr. 124–25 (emphasis added). According to the NFLPA, this testimony constitutes a sworn admission by Graves that he engaged in conduct prohibited by Paragraph 1, namely, assuring Wichard of his "intent to do a long-term deal" prior to signing Moore to a one-year contract. In ruling otherwise, the NFLPA contends, the special master erred as a matter of law by neglecting to apply Paragraph 1—which, as stated, prohibits any assurance of intent as to a multiple-year term—to the undisputed facts of this case.

■ However, the NFLPA's argument completely ignores the content of a lengthy dialogue between the special master and Graves that occurred later in the hearing:

> SPECIAL MASTER: Let me ask this question because I read what you have [said] in your deposition [concerning the September 9 meeting], which says, "what Rob [Moore] wanted to do is to have some assurance that we won't back out of our effort to sign a long-term deal. And he wants to come in, and he wants to hear from you and Mr. Bidwill that we will continue to work on the long-term deal. So I notified Mr. Bidwill, and Rob showed up to our place sometime between the hours of 10:30 and 11:30, and he sat down with Mr. Bidwill and Mr. Bidwill, Jr. And [they]

gave him assurances that we wouldn't abandon our efforts to do that."

> Now those are kind of general terms, and I want you, to the best of your knowledge, to tell me what did you say yourself in that [meeting], in that time, in that talk? What did you say to Mr. Moore about what you would do regarding a long-term deal, what words?
>
> GRAVES: Yes, sir. That we're going to work to continue to try to get a long-term deal done. That was my—that is what I stated to Rob Moore and to Gary Wichard, that we would work to try to continue—that I'm personally going to try to work to try to get a long-term deal done for Rob.
>
> SPECIAL MASTER: Rob is there?
>
> GRAVES: That is right. And I told Rob that myself.
>
> SPECIAL MASTER: You used the words, you say, "try to get a deal done"?
>
> GRAVES: Yes, sir, I did.
>
> SPECIAL MASTER: So he was not assured that, in effect, there would be—you're going to get this done?
>
> GRAVES: No, sir, he was not.
>
> SPECIAL MASTER: What about this business you're not going to have to play? Did you say, "you don't have to play for the one year [tender]"?
>
> GRAVES: No, sir, I never did.
>
> SPECIAL MASTER: Did Mr. Bidwill, either of the Mr. Bidwills, say anything of that kind?
>
> GRAVES: Not to my knowledge.
>
> SPECIAL MASTER: What did they say when they talked about this?
>
> GRAVES: What they said in the room that day was, "we are going to give you assurance that we are going to continue to work in good faith to get a long-term deal done."
>
> SPECIAL MASTER: He was satisfied with that?
>
> GRAVES: Yes, sir. Let me also, Professor, if I may take 30 seconds to paint the picture for you.

.　　　.　　　.　　　.　　　.

He had no assurance. We had given no indication at all that we had a deal in the works, that we were even close to a deal. His agent indicated that he thought we were close. I had no assurance—

SPECIAL MASTER: Well, you were close.

GRAVES: We were. In essence we were. In the final analysis, we were. But, Professor, in the course of negotiating, if I ever tell an agent or an agent tells me while he at the same time is seeking more money that we're close, then, to me, why should I negotiate?

SPECIAL MASTER: Well, you might have a deal, as has been pointed out, you could actually have a deal on the 9th. I'm not saying you did, but you could have. And then he could have come in at the time and said, "hey, if you want a happy camper here, you should come up with 250,000 more." You can tell them, "sorry, Charlie." But nobody can stop somebody from asking for more, even if you have a deal.

GRAVES: Professor, that was not the case here.

SPECIAL MASTER: I understand that. So there is no assurance. As far as you're concerned, you guys had no— not even a moral commitment to come to a deal? You had a moral commitment, as far as I understand, to work toward a deal?

GRAVES: Absolutely.

SPECIAL MASTER: But if you come to whatever your maximum was at some point and Mr. Bidwill had said sorry, and they turned it down, you would have felt, okay that was all right?

GRAVES: Yes, absolutely.

Hearing Tr. 202–07.

This exchange critically undermines the NFLPA's position in two respects. First, it eliminates any notion that the special

master misapplied Paragraph 1 in making his factual determinations. As he questioned Graves, the special master carefully focused on the pertinent legal issue raised by the September 9 meeting, namely, whether the Cardinals offered Moore anything more specific or material than an assurance to negotiate in good faith as to a long-term deal. The special master pressed Graves as to whether he said "try to get a deal done" or "get a deal done." He asked whether the parties had reached "even a moral commitment to come to a deal" rather than just a moral commitment to try to "work toward a deal." Moreover, the special master's written decision confirms the fact that he correctly framed the legal issue at stake here:

> [O]n September 9, 1999, Mr. Moore went to the Cardinal offices and met with Mr. Graves and the Club owner, Bill Bidwell, Sr. *They assured him that they would continue to negotiate in good faith to reach an agreement,* which appeared close at hand.

Decision at 3 (emphasis added). In short, there is no indication here, or anywhere else in the record, that the special master improperly assumed that an assurance of intent as to a multiple-year contract term, or as to any other material term, is permissible under Paragraph 1.

Second, Graves's testimony here undercuts the NFLPA's contention that, at the hearing, Graves unequivocally admitted that he had engaged in conduct prohibited by the SSA. To the contrary, during his colloquy with the special master, Graves repeatedly denied that either he or the Bidwills gave any material assurance of intent to Moore or Wichard. While Graves's statements here may appear inconsistent with his earlier testimony, the special master was fully entitled to believe this later version of events, especially in light of the fact that Graves's earlier "admission" occurred in the context of opposing counsel's skillful series of leading questions.[2] As the Eighth Circuit recently

---

2. Indeed, even during his earlier testimony, Graves firmly stated that he "dispute[d] the

connotation that we were talking about a specific deal." Tr. 124.

explained, the trier of fact "is best able to assess the value of testimony in light of corroborating and conflicting evidence, witness demeanor, and numerous other factors; its findings regarding witness credibility are thus given great deference and are 'virtually unreviewable on appeal.'" *See United States v. Johnson,* 169 F.3d 1092, 1098 (8th Cir.1999) (citation omitted). In light of these considerations, the court readily concludes that the special master's findings concerning the September 9 meeting were neither legally incorrect nor clearly erroneous.

## D. General Evidence of a Paragraph 1 Violation

Apart from its specific argument about assurances of intent at the September 9 meeting, the NFLPA makes a more general argument that the special master's ruling was clearly erroneous in light of the overall strength of its circumstantial case that the Cardinals and Wichard had an undisclosed arrangement of some kind at the time Moore signed the one-year contract. This evidence includes: (1) the fact that for over a year before the one-year deal was signed, neither party had discussed anything other than a multiple-year deal; (2) the fact that Wichard and Moore sought specific assurances that the Cardinals would not force him to play under the one-year contract; (3) the fact that Wichard wrote "Final Deal" on a multiple-year offer that, he testified, was received from the Graves September 9, the day the one-year contract was signed; and (4) the fact that the terms of the "Final Deal" are

nearly identical to the terms of the contract signed on September 22.[3]

Without question, the NFLPA has presented a strong circumstantial case that a Paragraph 1 violation occurred here. The special master acknowledged as much himself. *See* Decision at 2 ("There is no question ... that this evidence, though circumstantial, gives rise to an inference that the Arizona Cardinals had made a commitment to enter into a four-year contract at the time that the one-year contract was signed."). However, these circumstances, some of which are disputed, do not inevitably lead to the conclusion that the one-year agreement signed on September 9 was a sham. In fact, these circumstances are all consistent with the conduct of two parties who were very close to reaching an agreement, and who were continuing to negotiate in earnest to reach an agreement, but who had not made any specific promises or assurances apart from their intention to continue to negotiate in good faith.[4] As the NFLMC correctly points out, under the plain terms of Article VIII, Paragraph 9 and Article XV, Paragraph 1 of the SSA, the execution of a club's one-year franchise player tender while operating under a negotiating posture of this kind does not violate the SSA.

More important, the circumstances enumerated above were not the only evidence before the special master. As he stated in his written decision, the "credibility of the two witnesses," Graves and Wichard, was a "crucial factor" in his final determination. *Id.* at 3. And, apart from the inconsistency

---

**3.** The NFLPA also contends that the special master erroneously relied on inadmissible hearsay evidence concerning Rob Moore's stated reason for wanting to sign a one-year deal. Of course, to the extent that Moore's comments are offered to show their effect on the state of mind and conduct of Wichard and Graves, these out-of-court statements are not hearsay. *See* Fed.R.Evid. 801 (out-of-court statement is hearsay only if "offered in evidence to prove the truth of the matter asserted"). Whether or not Moore truly wanted to sign a one-year deal because of his sense of obligation to the team, the fact that Moore

informed the primary contract negotiators of his purported desire is admissible evidence. Further, in its own right, Moore's declaration of his "intent, plan, motive, design," is admissible under the "state of mind" exception to the general hearsay rule. Fed.R.Evid. 803(3). In any event, separate from Moore's statements, the special master had ample other evidence on which to base his decision.

**4.** Uncertainty as to the timing and the rhetorical meaning of the "Final Deal" document are more than enough to take it out of the category of smoking gun.

noted above, these two witnesses were adamant in their denial that any material assurance of any kind been made at the time of the one-year contract. Thus, as the special master explained at the hearing, "in order to find that this is a violation, with the burden of proof being on the Players Association and Class Counsel, I would have to find that [the witnesses] are not only not telling the truth, but essentially [that] the opposite is true—that is, they had made commitments." Hearing Tr. 279. Given the pivotal role that credibility determinations played in the special master's ruling, and given the fact that the burden was on the NFLPA to prove the Paragraph 1 violation, the court has no basis for concluding that the special master's ruling was clearly erroneous.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the special master's decision dated February 10, 2000 is affirmed.